OPINION AND ORDER
 

 PEREZ-GIMENEZ, District Judge.
 

 This age discrimination claim is before the Court on Sears’ motion for summary judgment. For the reasons stated herein, the motion is DENIED as to Camacho’s Age Discrimination in Employment Act claim, but GRANTED as to her Employee Retirement Income Security Act claim.
 

 Background
 

 The following summarizes those of plaintiff Camacho’s allegations which have record support, presented in the light most flattering to her claim.
 
 Greenberg v. Union Camp Corp.,
 
 48 F.3d 22, 26 (1st Cir.1995).
 

 Aida Camacho began her career with Sears in July 1972 when she was 27 years old. In 1987 she transferred to the Household Goods Department (HGD) at the Sears branch in Carolina, working as a sales clerk. By 1992 she was the senior and only full time employee in the HGD, earning $8.85 per hour. Her six colleagues in the department were all part-time employees who, it seems, earned half Camacho’s salary and received no benefits. Camacho was the
 
 de facto
 
 supervisor of the HGD, responsible for training the “part-timers,” and assuring the general functioning and orderliness of the department.
 
 [1]
 
 Camacho’s performance appraisals for the years 1989-92, though making no reference to her supervisory duties, demonstrate that she performed at or above Sears’ expectations.
 

 Camacho’s troubles began sometime in the Spring of 1992, when Sears appointed a new manager — identified only as “Mr. Alverio”— for the division of which the HGD was a part. Relations between Alverio and the plaintiff
 
 *115
 
 began poorly, and seem only to have gotten worse with time. Within a week of his arrival, Alverio held one-on-one meetings with all employees except the plaintiff. Shortly thereafter, Alverio began transferring various of Camacho’s supervisory responsibilities to Alicia Cruz Quiñones, a woman Camacho had trained two years earlier. In 1992, Cruz Quiñones was 25 years old. Though a “part-timer,” Cruz Quiñones’ hours were increased to 40 per week.
 

 Camacho testifies that Alverio ignored her in all respects, even refusing to greet her in the morning. More importantly, Alverio would not transmit management instructions to Camacho, preferring, instead, to communicate matters such as price changes to Cruz Quiñones. Thus, Cruz Quiñones became the new
 
 de facto
 
 head of the HGD. Cruz Quiñones’ authority was further increased when she was put in charge of the HGD’s cash register.
 

 The cash register appears to have been an important symbol. One incident, which Sears has not denied in any material respect, involved the installation of a new cash register. Over the course of three days, Alverio called each employee, one at a time, to receive training on the new machine. All of the employees in the department received the training except Camacho.
 

 The
 
 coup de grace
 
 occurred sometime in May or June of that year. In a meeting with Alverio and another Sears manager (identified as “Mr. Ibáñez”), Camacho was told that Sears was establishing a new salary structure for all employees. Camacho, as would many of the other employees in the Division, was to receive $4.25 per hour plus one percent commission, effectively reducing her guaranteed salary by more than 50 percent.
 
 [2]
 

 Perhaps anticipating that Camacho would not accept the new wage, Alverio and Ibáñez also suggested the following: (1) a severance package; (2) resign and reapply as a “part-timer;” or (3) accept the new terms and hope to be assigned later to a higher paying position. Camacho was told that her new salary would take effect on June 28, 1992, and that she had eight days to sign the waiver, which was then placed before her. After asking about her pension — and being told that she was too young to collect any portion of it— Camacho left the meeting.
 

 Shortly thereafter Camacho contacted an attorney. She also began discussions with various Sears officials to determine whether her options were really as limited as Alverio and Ibáñez said. Ibáñez later told Camacho that he would inquire of other Sears’ facilities about the availability of other suitable positions, but he never approached Camacho with a firm offer.
 

 Camacho also spoke with two other Sears managers (Dora Ortiz and Pedro de la Torre) who “led [Camacho] to believe” that Sears regularly instituted such dramatic salary restructurings in order to induce the older employees to resign.
 
 [3]
 
 At the end of June 1992, Camacho left for a three week vacation which had, apparently, been scheduled for some time.
 

 Upon her return to work near the end of July, Camacho found her name conspicuously absent from the HGD’s duty roster. She nonetheless resumed her normal hours, and concedes that she did so without interference or seeking an explanation from Sears man
 
 *116
 
 agement. Further fueling Camacho’s suspicions that Sears was “getting rid of her,” however, was the failure of her paycheck to be ready the next pay day. Upon bringing this omission to the paymaster’s attention, a hand-drawn cheek was prepared.
 

 Also during August 1992, Camacho began seeing a psychologist affiliated with Sears’ Employee Assistance Program. Dr. Myma Candelario’s treatment report documents Camacho’s growing depression, and nascent alcohol use. Dr. Candelario traced the source of Camacho’s depression to her job-related anxieties. Although nothing to this effect appears in the treatment report, Camacho stated in her deposition that
 

 [s]he [Dr. Candelario] told me that I couldn’t continue in that situation, that I had to talk to the manager so that he could change my job, and that if he did not do that that I should resign because that was going to affect me a great deal and she diagnosed depression.
 
 [4]
 

 Stating that she felt that she had no other choice, Camacho resigned on August 29, 1992. She spurned Alverio’s and Ibáñez’ attempts to dissuade her, which she felt were insincere.
 

 The subsequent years have not been good to Camacho. Her drinking grew into alcoholism and her depression worsened. These factors apparently ended her relationship with her long-time companion, Angel Mercado, who is also a plaintiff in this case. Camacho has not worked since leaving Sears, though she apparently visits her old workplace frequently.
 

 Based on the above allegations, Camacho claims damages and seeks relief under the federal Age Discrimination in Employment Act (“ADEA”), 29 U.S.C. § 621 et seq., as well as Puerto Rico’s anti-discrimination and wrongful discharge statutes, “Law 100,” 29 L.P.RA. § 146, and “Law 80,” 29 L.P.R.A. § 185a, respectively. Camacho further alleges that Sears’ conduct was motivated, at least in part, to deny her pension, and thus invokes the Employee Retirement Income Security Act (“ERISA”), 29 U.S.C. § 1140. Also in the mix are tort claims for emotional distress under Article 1802 of Puerto Rico’s Civil Code.
 
 [5]
 

 Sears has moved for summary judgment. Summary judgment, of course, is only appropriate when “the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.” Fed.R.Civ.P. 56(e). As Sears has asserted a lack of supporting evidence (as well as failure to state a cognizable claim), Camacho’s burden at this point is to “establish the existence of a triable issue which is both genuine and material to h[er] claim.”
 
 Pagano v. Frank,
 
 983 F.2d 343, 347 (1st Cir.1993).
 

 Camacho’s ERISA Claim
 

 Sears has moved for summary judgment on Camacho’s ERISA claim. To make out a claim for unlawful pension discrimination in violation of § 510 of ERISA, Camacho must show that Sears “was motivated by the specific intent of interfering with the employee’s ERISA benefits. ERISA provides no relief if the loss of an employee’s benefits was incidental to, and not the reason for, the adverse employment action.”
 
 Lehman v. Prudential Ins. Co. of America,
 
 74 F.3d 323, 330-31 (1st Cir.1996) (internal quotation and citations omitted). As Camacho has presented no evidence to support her ERISA claim, Sears’ motion is GRANTED.
 

 Camacho’s ADEA Disparate Treatment Claim
 

 Camacho’s age discrimination claim is predicated on two alternative theories of liability. First, she claims “disparate treatment.” “Disparate treatment is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their [age].... Proof of discriminatory motive is critical, although it can in some situations be
 
 *117
 
 inferred from the mere fact of differences in treatment.”
 
 Int'l Brotherhood of Teamsters v. United States,
 
 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977) (citation omitted).
 

 Motions for summary judgment in disparate treatment claims alleging wrongful, constructive discharge are evaluated under the well-known
 
 McDonnell Douglas
 
 framework.
 
 Greenberg v. Union Camp Corp.,
 
 48 F.3d 22, 26 (1st Cir.1995). To establish a
 
 prima facie
 
 case, Camacho must show (i) that she was over 40 years of age (and therefore protected by the ADEA) at the time of the events in question, (n) that her job performance was sufficient to meet Sears’ legitimate expectations, (iii) that she was constructively discharged, and (iv) that Sears replaced her with a person of roughly equivalent qualifications.
 
 Id.
 

 The recitation of the facts, above, demonstrates that factors (i), (ii) and (iv) are clearly satisfied. Sears argues vigorously, however, that Camacho was not constructively discharged. To establish a claim of constructive discharge the evidence must show that “the new working conditions would have been so difficult or unpleasant that a reasonable person in the employee’s shoes would have felt compelled to resign.”
 
 Greenberg,
 
 48 F.3d at 27 (internal quotation omitted).
 

 Here, Camacho has testified that (1) her new supervisor refused to so much as say hello to her, but that he did communicate with the younger employees; (2) that he stripped away her managerial responsibilities and gave them to a younger, less qualified employee; (3) that she was denied training given to younger employees; (4) that her salary was cut in half and that this reduction disproportionately impacted the older employees; (5) that Sears made this wage cut with the expectation that it would induce some of the older, more disproportionately affected employees to leave; and (6) that when she returned from vacation she was a non-entity in the department, having no scheduled hours and no paycheck ready at the end of the pay period. It is the Court’s view that these allegations, if proved, could convince a reasonable jury that Camacho was constructively discharged and that age played a motivating role in Sears’ actions.
 
 See e.g., Goss v. Exxon Office Sys. Co.,
 
 747 F.2d 885, 888-89 (3d Cir.1984) (constructive discharge where, along with other factors, change in sales representative’s territory constituted substantial cut in pay);
 
 Nunez-Soto v. Alvarado,
 
 918 F.2d 1029, 1030-31 (1st Cir.1990) (demotion
 
 without
 
 salary cut insufficient for constructive discharge).
 

 Sears’ principal argument to the contrary focuses on the evidentiary weight of the salary reduction. Sears avers that the policy was “neutrally” imposed on all Sears employees, regardless of age, and thus is not evidence of intentional age discrimination. (Note that Sears’ argument constitutes the “production” of a “legitimate, nondiseriminatory reason for its actions.” Thus, Sears has fulfilled its “burden” at the second step of the
 
 McDonnell Douglas
 
 regime.
 
 Greenberg,
 
 48 F.3d at 26.) To support its position, Sears cites the U.S. Supreme Court’s recent decision in
 
 Hazen Paper Co. v. Biggins,
 
 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993).
 

 Hazen Paper
 
 involved a disparate treatment claim by a sixty-two year old employee who was fired several weeks before his pension vested. The record contained scant direct or circumstantial evidence of discrimination. Rather, Biggins’ ADEA claim rested primarily on his contention that he was fired to prevent his pension rights from vesting. The First Circuit affirmed a jury verdict for Biggins, finding that “age was inextricably intertwined with the decision to fire Biggins. If it were not for Biggins’ age, sixty-two, his pension rights would not have been within a hairbreadth of vesting.”
 
 Biggins v. Hazen Paper Co.,
 
 953 F.2d 1405, 1412 (1st Cir.1992).
 

 In reversing, the Supreme Court held that “there is no disparate treatment under the ADEA when the factor motivating the employer is some feature other than the employee’s age.”
 
 Hazen Paper,
 
 507 U.S. at 609, 113 S.Ct. at 1705. The Court further observed that, “[w]hen the employer’s decision
 
 is
 
 wholly motivated by factors other than age, the problem of inaccurate and stigmatizing stereotypes disappears. This is true even if the motivating factor is correlated
 
 *118
 
 with
 
 age...Id.
 
 at 611, 113 S.Ct. at 1706 (emphasis in original).
 

 In the instant case, Sears equates Biggins’ pension status with Camacho’s relatively high salary: though
 
 correlated
 
 with age, Sears asserts that age was not the reason that Camacho (and the other older workers) tended to have larger salary reductions. Rather, Sears avers that the reduction was the product of an across-the-board, age-neutral policy, motivated by Sears’ asserted need to lower personnel costs and increase the productivity of its work force.
 
 [6]
 
 As such, Sears argues, the salary reduction — like the pension tampering evidence in
 
 Hazen Paper
 
 — is not evidence of age discrimination, and must be excluded from any consideration of Camacho’s disparate treatment claim.
 
 See Houghton v. SIPCO, Inc.,
 
 38 F.3d 953, 959 (8th Cir.1994).
 

 As noted in the exposition of the facts, however, Camacho has presented evidence suggesting that the policy was not the product of an entirely age-neutral decision-making process. In other words, she has presented evidence that Sears’ proffered explanation is a pretext designed to mask the company’s discriminatory motivation.
 
 See Greenberg,
 
 48 F.3d at 26-27. Two supervisors, she reports, told her that Sears used the strategy of across-the-board salary reductions to induce the older employees to resign.
 
 Hazen Paper
 
 directly addressed such employer decision-making, expressly refusing to insulate it from liability:
 

 We do not preclude the possibility that an employer who targets employees with a particular pension [or salary] status on the assumption that these employees are likely to be older thereby engages in age discrimination. Pension [or salary] status may be a proxy for age, not in the sense that the ADEA makes the two factors equivalent ... but in the sense that the employer may suppose a correlation between the two factors and act accordingly.
 

 Hazen Paper,
 
 507 U.S. at 612-13, 113 S.Ct. at 1707. Here, Camacho’s theory is that Sears was aware that the older employees had higher salaries, and that Sears acted with the expectation that the policy would induce some of them to leave.
 
 Hazen Paper
 
 makes clear that this is admissible evidence of age discrimination.
 

 Moreover, Camacho’s claim would survive Sears’ motion for summary judgment even without evidence of the salary reduction. The final disposition of
 
 Hazen Paper
 
 guides this determination. The Supreme Court summarized the ease against the Hazen Paper Co. absent the pension tampering evidence as follows: “two isolated comments,” and the fact that Biggins “was asked to sign a confidentiality agreement, even though no other employee had been required to do so, and his replacement was a younger man who was given a less onerous agreement.”
 
 Hazen Paper,
 
 507 U.S. at 613, 113 S.Ct. at 1708. The First Circuit nonetheless found this sufficient evidence to affirm its, and the jury’s original ruling.
 
 Biggins v. Hazen Paper Co.,
 
 30 F.3d 126 (1st Cir.1994) (table). As Camacho’s allegations, absent the pay reduction evidence, are significantly more substantial, her claim must survive Sears’ motion for summary judgment.
 

 Camacho’s ADEA Disparate Impact Claim
 

 Camacho also claims that Sears is liable under the doctrine of “disparate impact.” “[C]laims that stress ‘disparate impact’ involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity.”
 
 Int'l Brotherhood of Teamsters v. United States,
 
 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977) (citation omitted). Disparate impact liability enables plaintiffs to make a prima facie case of employment discrimination absent proof of the employer’s discriminatory motive or intent.
 
 Id.
 
 A practice with disparate impact may also be circumstantial evidence of discriminatory intent.
 
 Sweeney v. Bd. of Trustees of Keene State College,
 
 569 F.2d 169, 175 (1st Cir.1978), vacated on other grounds, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978);
 
 Hiatt v.
 
 
 *119
 

 Union Pacific R.R. Co.,
 
 65 F.3d
 
 838,
 
 842
 
 n. 4
 
 (10th Cir.1995).
 

 The essence of Camacho’s claim is that the salary restructuring, which Sears avers was imposed on all employees “neutrally,” without regard to age, disproportionately affected the ADEA-proteeted workers, and that it was not justified by business necessity. As recounted in footnote two, the policy significantly reduced the salaries of three of the four employees in the protected group. Only three other employees, or less than five percent of those under forty, received comparable wage reductions.
 

 Disparate impact, of course, is a Title VII doctrine that was developed by the Supreme Court in the seminal ease of
 
 Griggs v. Duke Power Co.,
 
 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Congress enacted the doctrine into the text of Title VII in the Civil Rights Act of 1991, codified at 42 U.S.C. § 2000e-2(k)(l)(A). Congress did not, however, make similar amendments to the ADEA Thus, it remains an open question whether ADEA liability may be premised on the disparate impact of the challenged employment practice.
 
 See Hazen Paper,
 
 507 U.S. at 610, 113 S.Ct. at 1706 (“we have never decided whether a disparate impact theory of liability is available under the ADEA, ... and we need not do so here”). For a summary of the debate on this issue, see Michael C. Sloan, Comment,
 
 Disparate Impact in the Age Discrimination in Employment Act: Will the Supreme Court Permit It?,
 
 1995 Wis.L.Rev. 507, 508 n. 11 (citing law review articles and cases), and 511-22 (summarizing the issues).
 

 Although the Supreme Court has never addressed the issue, it is no stranger to the lower courts. There are at least two reported appellate decisions affirming ADEA liability based
 
 solely
 
 on disparate impact.
 
 Geller v. Markham,
 
 635 F.2d 1027 (2d Cir.1980),
 
 cert. denied,
 
 451 U.S. 945, 101 S.Ct. 2028, 68 L.Ed.2d 332 (1981);
 
 Leftwich v. Harris-Stowe State College,
 
 702 F.2d 686 (8th Cir. 1983). Other circuits have assumed the applicability of the doctrine. They have done so, however, in circumstances where the assumption was, it may be argued, not dispositive of the case.
 
 See, e.g., MacPherson v. University of Montevallo,
 
 922 F.2d 766, 773, n. 14 (11th Cir.1991) (affirming directed verdict for the defendant-employer “without deciding that a disparate impact claim of age discrimination can be made where (as here) plaintiffs allege a practice which is based on the market”);
 
 Mangold v. Calif. Pub. Utilities Com’n,
 
 67 F.3d 1470, 1474 (9th Cir.1995) (assuming applicability of the doctrine in affirming award for plaintiff, but noting that the verdict also rested on the jury’s alternative finding of intentional discrimination);
 
 Houghton v. SIPCO, Inc.,
 
 38 F.3d 953, 958-59 (8th Cir.1994) (reversing verdict for plaintiff because jury was incorrectly instructed on the employer’s burden in defending a disparate impact claim);
 
 Wooden v. Board of Educ.,
 
 931 F.2d 376, 379-80 (6th Cir.1991) (affirming summary judgment for defendant because plaintiff failed to make the necessary showing of disparate impact).
 

 The First Circuit, it appears, is among those which have “assumed without deciding” the question. In
 
 Holt v. Gamewell Corp.,
 
 797 F.2d 36, 37 (1st Cir.1986), the Court stated that “[a]n employee suing his employer for age discrimination must show either disparate treatment or a discriminatory impact.” In a recent “unpublished” decision, however, the Court characterized
 
 Holt
 
 as “assum[ing] ... for the purposes of th[at] opinion ... the applicability of the [disparate impact] theory____”
 
 Graffam v. Scott Paper Co.,
 
 1995 WL 414831, *3 (1st Cir.).
 

 Thus, “[t]he weight of authority ... is that disparate impact is a viable doctrine under the age discrimination law____”
 
 Finnegan,
 
 967 F.2d at 1163. Several recent appellate decisions, however, applying the full panoply of statutory interpretation techniques, have held that it is improper to carry over disparate impact analysis from Title VII to the ADEA.
 
 E.E.O.C. v. Francis W. Parker School,
 
 41 F.3d 1073, 1076-78 (7th Cir.1994);
 
 DiBiase v. SmithKline Beecham Corp.,
 
 48 F.3d 719, 732 (3d Cir.1995);
 
 Ellis v. United Airlines, Inc.,
 
 73 F.3d 999, 1008-09 (10th Cir.1996).
 

 The question is whether the logic of these decisions is sufficiently persuasive to rebut the prevailing “presumption” in the First Circuit of the doctrine’s applicability to the
 
 *120
 
 ADEA
 
 [7]
 
 For the reasons explained in the following discussion, the Court finds that the answer is no.
 

 First, nothing in the text of the ADEA precludes the application of disparate impact analysis. True, “the statutory language does not explicitly provide for disparate impact liability,”
 
 DiBiase,
 
 48 F.3d at 733, but the same could be said of Title VII before its amendment in 1991. Nonetheless, the Supreme Court identified the
 
 identical
 
 language as supporting disparate impact in Title VII.
 
 General Elec. Co. v. Gilbert,
 
 429 U.S. 125, 137 & n. 13, 97 S.Ct. 401, 408 & n. 13, 50 L.Ed.2d 343 (1976).
 
 Compare
 
 42 U.S.C. § 2000e-2(a) (Title VII) with 29 U.S.C. § 623(a)(2) (ADEA).
 

 Both laws prohibit employer conduct that “would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual’s
 
 age
 
 [in the case of the ADEA, or]
 
 race, color, religion, sex, or national origin”
 
 [in the case of Title VII]. 29 U.S.C. § 623(a)(2) and 42 U.S.C. § 2000e-2(a) (emphasis added).
 
 [8]
 
 As Chief Judge Carter cogently explained in
 
 Caron v. Scott Paper Co.,
 
 834 F.Supp. 33, 37-38 (D.Me.1993), a recent ADEA-disparate impact case, the phrase “or otherwise adversely affect” may reasonably be interpreted as forbidding “any policy having a more harmful effect on older people than on their co-workers.” The Supreme Court’s direct citation to this language indicates that it reached the same conclusion.
 
 See also Costa v. Markey,
 
 706 F.2d 1, 4 (1st Cir.1982) (citing § 703(a)(2) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a), as the statutory basis for disparate impact analysis).
 

 In 1991, Congress amended Title VII by providing express statutory support for disparate impact liability. Some argue that Congress’ failure to likewise amend the ADEA signaled its intent to limit the doctrine to Title VII.
 
 Ellis,
 
 73 F.3d at 1008. This is a makeweight. There is no evidence the issue was even on Congress’ agenda at the time. The 1991 amendments responded to several Supreme Court opinions which arguably hurt Title VII plaintiffs. There was no comparable judicial assault on the ADEA, as no court had ever found disparate impact analysis unavailable to ADEA plaintiffs. “It seems unpersuasive, therefore, to read so much into congressional inaction.” Sloan
 
 supra,
 
 at 518.
 

 Arguments over legislative history, which all focus on a 1965 report by the Secretary of Labor — are equally unpersuasive. The argument goes as follows: the Secretary’s Report recommends no more than outlawing rigid age limits; other measures, such as training and vocational education, were recommended to address structural factors that tend to affect older workers; this dichotomy parallels the distinction between the harms suffered from disparate treatment and disparate impact; therefore (it is argued), only the former theory of liability is envisioned in the Secretary’s Report.
 
 See, e.g., Ellis,
 
 73 F.3d at 1008.
 

 As Professor Kaminshine contends, however, “commentators in opposition infer too much from the Secretary’s preoccupation with overt age restrictions.” Steven J. Kaminshine,
 
 The Cost of Older Workers, Disparate Impact, and the Age Discrimination in Employment Act,
 
 42 Fla.L.Rev. 229, 290 (1990). The Secretary’s Report was issued five years before
 
 Griggs,
 
 yet both sought to ameliorate the harm older workers suffer from the imposition of “arbitrary” employment policies. Thus, even if one is inclined
 
 *121
 
 to put great store in legislative history, the Secretary’s Report is hardly dispositive of this debate.
 
 See Caron,
 
 834 F.Supp. at 38.
 

 Opponents also cite
 
 Hazen Paper
 
 as supporting the confinement of the disparate impact doctrine to Title VII. In
 
 Hazen Paper
 
 the Court stated that
 

 [disparate treatment ... captures the essence of what Congress sought to prohibit in the ADEA. It is the very essence of age discrimination for an older employee to be fired because the employer believes that productivity and competence decline with old age---- Congress’ promulgation of the ADEA was prompted by its concern that older workers were being deprived of employment on the basis of inaccurate and stigmatizing stereotypes.
 

 Hazen Paper,
 
 507 U.S. at 610, 113 S.Ct. at 1706. If disparate treatment “captures the essence” of the ADEA, some have reasoned, then disparate impact, which permits the imposition of liability without probing the employer’s motivation, must not.
 
 DiBiase,
 
 48 F.3d at 732-33;
 
 Ellis,
 
 73 F.3d at 1008-09;
 
 Francis W. Parker,
 
 41 F.3d at 1076-77.
 

 This view of the ADEA’s “essence” parallels a similar observation about Title VII made by the same Justice who wrote
 
 Hazen Paper:
 
 “statistical imb alancéis] are not, in and of themselves, the evils Congress sought to eradicate from the employment setting.”
 
 Price Waterhouse v. Hopkins,
 
 490 U.S. 228, 275, 109 S.Ct. 1775, 1804, 104 L.Ed.2d 268 (1989) (O’Connor, J., concurring in the judgment). This similarity, combined with the concurring opinion in
 
 Hazen Paper,
 
 507 U.S. at 618, 113 S.Ct. at 1710 (“there are substantial arguments that it is improper to carry over disparate impact analysis from Title VII to the ADEA”) (Kennedy, J., concurring), is what has presumably led some to view
 
 Hazen Paper
 
 as shedding light on the instant question. Though these considerations may show the direction in which the winds are blowing, they are not the stuff on which a trial court may base its interpretation of the law.
 

 Opponents also make policy arguments, focusing on the reputed “purpose” of disparate impact liability and its concomitant inapplicability to the ADEA.
 
 DiBiase,
 
 48 F.3d at 734;
 
 Ellis,
 
 73 F.3d at 1009.
 
 Griggs
 
 stated that “practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to ‘freeze’ the status quo of prior discriminatory employment practices.”
 
 Griggs,
 
 401 U.S. at 430, 91 S.Ct. at 853. This policy, some assert, cannot be transplanted into the ADEA: “In
 
 Griggs,
 
 the critical fact was the link between the history of educational discrimination and the use of that discrimination as a means of presently disadvantaging African Americans. These concerns simply are not present when the alleged disparate impact is based on age.”
 
 DiBiase,
 
 48 F.3d at 734 (quotation omitted).
 

 This view might have been persuasive twenty years ago. In 1977, however, the Supreme Court extended the disparate impact doctrine to sex discrimination claims.
 
 Dothard v. Rawlinson,
 
 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977). The Court held that certain height and weight requirements had an illegal, disparate impact upon women, a decision that had nothing to do with historic discrimination. Since then, plaintiffs of various ethnic groups have won disparate impact claims, e.g.,
 
 Davis v. Cnty. of Los Angeles,
 
 566 F.2d 1334 (9th Cir.1977), challenging a variety of employment practices.
 
 Watson v. Fort Worth Bank & Trust,
 
 487 U.S. 977, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988). Accordingly, the Court can find nothing about the essential “policy basis” for disparate impact that makes it inapplicable to the ADEA.
 

 The most compelling arguments focus on the statutory exception that insulates from liability employment actions based on “reasonable factors other than age” (RFOA), 29 U.S.C. § 623(f)(1). By its express terms, the RFOA exception permits decision-making based on factors other than age, so long as they are reasonable. Those who argue that the RFOA exception insulates policies of the sort challenged in the instant case assert that decisions based on payroll factors are
 
 per se
 
 reasonable.
 
 See Markham v. Geller,
 
 451 U.S. 945, 949, 101 S.Ct. 2028, 2030, 68 L.Ed.2d 332 (1981) (Rehnquist, J., dissenting from denial of
 
 certiorari).
 
 Under this view, the only issue for judicial scrutiny would be
 
 *122
 
 whether the asserted RFOA exception is a pretext.
 

 For support, opponents cite the interpretation of a similar provision in the Equal Pay-Act. 29 U.S.C. § 206(d)(1) immunizes from challenge pay “differentials] based on any other factor other than sex” [sic]. This provision has been interpreted as precluding disparate impact analysis. Thus, a well-known jurist has asked why “[s]hould not the parallel structure of the ADEA, enacted four years later, yield the same result?”
 
 Metz v. Transit Mix, Inc.,
 
 828 F.2d 1202, 1220 (7th Cir.1987) (Easterbrook, J., dissenting).
 

 The answer is that the two laws differ in an important respect. The Equal Pay Act merely requires the employer to demonstrate the neutral factor’s
 
 existence. Dragon v. State of R.I.,
 
 936 F.2d 32, 37 (1st Cir.1991). This is in accord with the Equal Pay Act’s text, which exempts
 
 “any
 
 other factor other than sex.” 29 U.S.C. § 206(d)(1). Under the ADEA, on the other hand, the employer must demonstrate the
 
 reasonableness
 
 of the challenged practice — a burden essentially identical to that required to defeat a claim of disparate impact under Title VII.
 
 [9]
 
 Consequently, the Equal Employment Opportunity Commission’s (EEOC) regulations interpret the RFOA exception as expressly providing for disparate impact analysis. 29 C.F.R. § 1625.7(d).
 
 [10]
 
 Judge Easterbrook’s interpretation, on the other hand, would require judicial revision of the statutory language. The exception would no longer be for
 
 “reasonable
 
 factors other than age,” but for
 
 “bona fide
 
 factors other than age.”
 

 The debate over the RFOA reveals what appears to be the real concern about extending disparate impact analysis to the ADEA: judges are reluctant to “presume to question the business judgment of company managers.”
 
 Furr v. Seagate Technology,
 
 82 F.3d 980, 988 (10th Cir.1996).
 
 See also DiBiase,
 
 48 F.3d at 734 n. 21 (“Such a regime could subject employers to unreasonable intrusions by juries into their business practices”). As frequently is the case, Judge Posner has eloquently framed the issue:
 

 We could accept the plaintiffs approach, to the extent of finding a disparate impact, and then rule that the employer’s business justification was compelling---- But that would not be a good argument, given the limited competence of federal judges to redesign corporate compensation packages____ It would mean that every time an employer made an across-the-board cut in wages or benefits he was prima facie violating the age discrimination law.
 

 ‡ ‡ H: ‡ ‡ $
 

 There is something wrong with an interpretation of the [ADEA] that forbids a bankrupt corporation to adopt a company-wide policy of limiting paid vacations to 4 weeks a year and that would as a practical matter forbid all firms to reduce wages or fringe benefits.
 

 Finnegan v. Trans World Airlines, Inc.,
 
 967 F.2d 1161, 1165 (7th Cir.1992).
 

 Undoubtedly, permitting plaintiffs to present evidence of disparate impact when challenging across-the-board wage cuts or reductions-in-foree will facilitate making out a prima facie case. However, modem labor and workplace standard laws “intrude” on employers’ discretion in many respects. The reasonableness of certain employment practices will typically be clear on their face. Bankrupt employers, such as in
 
 Finnegan,
 
 will almost always win motions for summary judgment on reasonableness-business justification grounds. However, Congress, through the ADEA, has assigned the task of assessing the reasonableness of other conduct to the courts — a responsibility that should not be shirked lightly.
 

 
 *123
 
 In the case at bar, Sears has proffered nothing more than a self-serving affidavit to support the business justification of the across-the-board wage reduction in question. If Judge Posner’s view is that Sears should not be asked to justify its policy at all, then his view conflicts with (1) the language of the ADEA as it has been reasonably interpreted by the executive agency charged with its enforcement,
 
 see Chevron v. Natural Resources Defense Council,
 
 467 U.S. 837, 842-44, 104 S.Ct. 2778, 2781-83, 81 L.Ed.2d 694 (1984) (holding that an executive agency’s reasonable interpretation of ambiguous legislation is to be accorded deference by reviewing courts), and (2) the controlling presumption in this circuit. Therefore, the Court holds that ADEA plaintiffs may base their claims on the disparate impact theory of liability.
 

 Having dispensed with this threshold issue, the only question is whether Camacho has made out a prima facie case. Sears argues that she has not. Ordinarily, the plaintiff in a disparate impact claim “bears a heavy burden and often must amass a great deal of data (and subject it to expert statistical analysis) to show the disparate impact.”
 
 Metz,
 
 828 F.2d at 1215 (Easterbrook, J., dissenting). Here, Camacho has proffered no comparative statistics. Rather, she points to the aggregate numbers, asserting that statistical sampling is unnecessary when the at-issue policy’s impact on the entire population is readily ascertainable. Camacho proffers that less than five percent of those under forty received wage reductions of $3.00 per hour or more, while 75% of those over 40 received comparable reductions.
 

 The question is whether these internal work force comparisons are relevant. In the typical Title VII disparate impact case, where the challenged practice usually involves some workforce selection process, the answer is clearly no. In such cases the proper comparison is between the composition of the qualified persons in the relevant labor market and the persons holding the at-issue jobs.
 
 Wards Cove Packing Co. v. Atomo,
 
 490 U.S. 642, 650-55, 109 S.Ct. 2115, 2121-24, 104 L.Ed.2d 733 (1989). Unfortunately, no similar comparison is possible in this ease. Thus, the Court sees no alternative but to consider Camacho’s proffered internal work-force statistics.
 
 See Walther v. Lone Star Gas Co.,
 
 952 F.2d 119, 122 (5th Cir.1992) (conducting similar analysis).
 

 The First Circuit’s decision in
 
 Schuler v. Polaroid Corp.,
 
 848 F.2d 276 (1st Cir.1988), a reduction-in-force case, provides some guidance. There, the Court stated that “[t]he fact that a neutral discharge policy has an adverse effect on a single employee or even a few employees does not itself create ... a prima facie case of discrimination.”
 
 Id.
 
 at 279 (quotation omitted). The Court went on to identify the relevant, missing information: “size of the pool of potentially affected employees, the age or kind of employee likely in the pool, the nature of the work force ... or the way in which these employees were treated that would permit a fact finder to find actionable age discrimination.”
 
 Id.
 

 In the instant case, all the information identified by
 
 Schuler
 
 as pertinent is in the record. The data goes beyond identifying a few adversely affected employees: Camacho has identified the entire pool of potentially affected employees, demonstrating the ratio, and absolute numbers, of affected employees in the protected class versus those in the unprotected class. As Sears does not proffer any evidence suggesting that some factor other than age explains the policy’s disparate impact, the Court finds that Camacho has, at the least, made out a prima facie case of disparate impact.
 
 See Caron,
 
 834 F.Supp. at 39.
 

 Conclusion
 

 Sears’ motion for summary judgment on Camacho’s ERISA claim is GRANTED. In all other respects, Sears’ motion (Dkt. # 29) is
 
 DENIED.
 

 IT IS SO ORDERED.
 

 [1]
 

 . Many of Camacho’s allegations are supported by her former co-worker, Alicia Cruz Quinones. See Cruz Quinones’ affidavit.
 

 [2]
 

 . Seventy-four employees at various Sears branches in Puerto Rico were affected. Prechange, these employees were paid at a variety of hourly rates, based on their initial wage when hired, plus annual percentage increases.
 

 Post-change, two salary structures were in effect. One paid $4.25 per hour plus the one percent commission, as in Camacho’s case. The other paid $3.50 per hour, plus, the Court assumes, a higher commission.
 

 Of the 74 employees, four were in the ADEA protected age group at the time of the change. Three of these four (75%) received pay reductions of at least $3.00 per hour, or in percentage terms, of at least 45% of their original salary. (Camacho received a 52% pay cut.) Of the seventy employees younger than 40, only three (approximately 4%) received comparable wage reductions.
 

 It should also be noted that of the six employees who received pay reductions of at least $3.00 per hour, only one was younger than 39. This is potentially important for purposes of the Puerto Rico law claim, since “Law 100” does not specify a particular age at which persons come trader the law’s protection. 29 L.P.R.A. § 146.
 

 [3]
 

 . Camacho’s deposition of May 16, 1995 at 41-44.
 

 [4]
 

 . Camacho’s October 1995 deposition at 25.
 

 [5]
 

 . The discussion here focuses entirely on Camacho’s federal claims.
 
 See Ibáñez v. Molinos de P.R., Inc.,
 
 114 D.P.R. 42, 54-57 (1983).
 

 [6]
 

 . Affidavit of James Boozer.
 

 [7]
 

 . In this regard, it must be noted that the three decisions cited above vary in their precedential force. In
 
 DiBiase,
 
 for example, although the Court devoted four pages to the issue, the disparate impact discussion is entirely dicta.
 
 DiBiase,
 
 48 F.3d at 731 ("because DiBiase is not pursuing a disparate impact claim, the issue is not before us"). The reach of
 
 Francis W. Parker
 
 is similarly unclear, as that decision is arguably limited to applicants for employment, who, the Court found, were not protected by the ADEA. 41 F.3d at 1077-78.
 

 [8]
 

 . Aside from the use of “age” in the ADEA, and Title VII's usage of "race, [etc.]," the two laws employ essentially identical prohibitory language. Based on this textual similarity, the Supreme Court uses practically identical interpretive regimes when applying the two laws.
 
 Trans World Airlines, Inc. v. Thurston,
 
 469 U.S. 111, 121, 105 S.Ct. 613, 621-22, 83 L.Ed.2d 523 (1985).
 

 [9]
 

 . Tide VII does not forbid all employer practices that disparately impact some protected group.
 
 Los Angeles Dept. of Water & Power v. Manhart,
 
 435 U.S. 702, 710 n. 20, 98 S.Ct. 1370, 1376 n. 20, 55 L.Ed.2d 657 (1978). The law only prohibits those practices that are not "job related for the position in question and consistent with business necessity____” 42 U.S.C. § 2000e-2(k)(l)(A)(i).
 

 [10]
 

 . The regulation provides that when a practice is defended as “a 'factor other than’ age, and such a practice has an adverse impact on individuals within the protected age group, it can only be justified as a business necessity.” 29 C.F.R. § 1625.7(d).