[No. G017833. Fourth Dist., Div. Three. July 25, 1997.]

MICHAEL J. MARKS, Plaintiff and Appellant, v.
LORAL CORPORATION et al., Defendants and Respondents.

**COUNSEL**

James J. Guziak for Plaintiff and Appellant.

Catherine A. Evans for Defendants and Respondents.

**OPINION**

**SILLS, P. J.—**

## I

### *Introduction*

Michael J. Marks appeals from a judgment after the jury returned a defense verdict in his age discrimination and retaliation lawsuit against his former employer, Loral Corporation, and several other related entities and persons. He presents a series of challenges to various jury instructions, special verdict forms, and evidentiary rulings given by the trial court. Most

of his contentions are simply cavils about wording, and do not establish error, much less prejudicial error.

One of Marks's arguments, however, has some real substance to it. For years now, the federal courts have struggled, in applying federal age discrimination law, with the problem of whether an employer's policy or practice which has a "disparate impact" on older workers generally constitutes illegal age discrimination. A few years ago, Justice Kennedy noted the issue has yet to be resolved by the United States Supreme Court. (See *Hazen Paper Co.* v. *Biggins* (1993) 507 U.S. 604 [113 S.Ct. 1701, 1710, 123 L.Ed.2d 338] (conc. opn. of Kennedy, J.).) In the present case, Marks argues that a particular jury instruction was improper because it told the jury that an employer was entitled to prefer lower paid workers to higher paid workers, even if that preference results in choosing younger workers. Marks contends that the instruction was not proper. If it were, he says, it would eliminate the "vast majority" of age discrimination cases because of the "high correlation" between age and salary level.

In this case we need not decide the broad question of whether "disparate impact analysis," as labor law mavens style it, can *ever* apply to age discrimination claims, under either federal or California law. We do, however, determine that the particular jury instruction here—which deals with the impact of compensation differentials in employer decisionmaking—was correct under both federal and state law: Employers may indeed prefer workers with lower salaries to workers with higher ones, even if the preference falls disproportionately on older, generally higher paid workers. Both the text and intent of the federal and state age discrimination statutes compel such a result. Moreover, when we look at the origins of the disparate impact doctrine, we find that, by its very nature, it was never intended to apply to something so basic to the running of any enterprise as its costs of doing business. There was thus no error in giving the instruction and the judgment must be affirmed.

## II

### Facts

In 1988, Marks was a member of Ford Aerospace's corporate finance staff in Michigan. That year the unit moved to Newport Beach, California. Marks was divorced and his children were in Chicago, relatively nearby. Seeking to avoid the transfer, he approached various people on Ford's human resources staff to see if there was a "possibility" he might qualify for another position in Michigan. His efforts were unsuccessful and in July he moved out to California along with the rest of the corporate finance staff.

In 1990, Loral Corporation bought Ford Aerospace Corporation, and Marks found himself working for Loral Aerospace. In January 1991 Marks filed an age discrimination complaint with the Equal Employment Opportunities Commission against Ford Aerospace, charging that when Ford Aerospace was sold to Loral, several of his younger peers had been offered jobs in Michigan, but he had not. (Marks mistakenly thought that his complaint was against Ford Aerospace only, and Loral would not assume liability for such claims in its purchase of Ford Aerospace.)

Most of Loral Aerospace's Newport Beach corporate finance staff positions were eliminated in 1992, including Marks's. New accounting departments, however, were being created at seven other locations across the country. While Loral Aerospace had no authority to direct any other division to employ any particular individual, the company's Newport Beach human resources officer tried to help Marks find a position at one of the other locations by revising his resume, informing other divisions that Loral would pay his relocation costs, sending his resume to other divisions, and allowing him to use company computers, resume services, fax machines and telephones after his termination. (Marks's own efforts to find work at the new locations appear to have been minimal; his attorney would later argue to the court that, because he was a member of a protected class, he need not show that he applied for any specific openings.) Ultimately, all members of the corporate finance staff willing to relocate found new positions, except for Marks and one other, who was also over 40 years old.

Meanwhile, in May 1992, the Equal Emloyment Opportunity Commission (EEOC) stated that its investigation had not uncovered evidence establishing his claims, and informed him of his right to sue. Marks, then age 49, was laid off in August 1992. He brought this suit pursuant to state and federal age discrimination laws, contending that his age was a factor in his not being able to secure another position with the company, particularly a position in Colorado Springs where several accounting positions were open. The case went to trial on claims of age discrimination and retaliation. After a 16-day trial, the jury returned a 12-0 defense verdict on the age discrimination claim and a 9-3 defense verdict on the retaliation claim. Marks then filed this appeal.

### III

*The Mixed Motives Instruction*

Marks first claims that the trial court erred in refusing to give one paragraph of his special instruction No. 3, dealing with proving employment

discrimination under the Fair Employment and Housing Act. (See Gov. Code, § 12900 et seq.) The language omitted was: "Employment decisions can be the product of 'mixed motives' that include permissible and impermissible considerations. In such cases, the Plaintiff need only prove by preponderance of all the evidence that there exists a causal connection between the Plaintiff's protected status and the Defendants' adverse actions. Thus, the Plaintiff is entitled to prevail on the 'disparate treatment' theory of liability if the evidence shows that an adverse employment action was caused, at least in part, by a discriminatory motive."

There was no error. First, a portion of the instruction which the trial court *did* give to the jury told its members that plaintiff could prevail if "age played *a* motivating *part*" (italics added) in a decision, so Marks can hardly complain that the court precluded him from informing the jury that if his employer had a bad reason and a good reason, he should win. Second, the reference to "causal connection" between a "protected status" and an "adverse action" is hopelessly vague and overbroad—it would have been clear error to instruct the jury in that language—because it could have mislead the jury into a finding of discrimination based merely on the basis of a correlation between compensation and age, which, as we discuss in more detail in part IX, *post*, is not the law.

IV

*The Duty to Transfer Instruction*

Marks next argues that the trial court erred in refusing his special instruction No. 15, which would have told the jury: "An employer has no duty to transfer or 'place' an employee scheduled for layoff in an available position elsewhere in the company. To the extent Defendants voluntarily assumed such a duty by their actions and/or statements, an inference of discrimination is raised if the Plaintiff shows that others not in his protected class were treated more favorably."

There is no error here, because the phrase "To the extent Defendants voluntarily assumed such a duty" could have misled the jury into thinking that the court had already determined that the defendants *had* assumed a duty to place all of their employees elsewhere, something which they hotly disputed. Marks points to no evidence that Loral *ever* assumed a *duty* (see *Rose* v. *Wells Fargo & Co.* (9th Cir. 1990) 902 F.2d 1417) to find jobs for its laid-off employees. It is one thing for enlightened corporate personnel offices to offer assistance to employees who are about to be laid off, it is another to assume an *obligation* to do so. Marks adduces no authority for the

idea that when employers do a good turn for their employees they are thereby creating, ipso facto, a legal obligation to do so. Indeed, when one considers the incentives established by such a rule, it is no wonder authority for it is lacking. We can think of few things more pernicious than a rule which would, in effect, penalize employers for offering assistance to employees who are about to be laid off. Marks makes the error of thinking that because many of his coworkers found jobs within the company, Loral undertook the legal obligation to find a job for anyone willing to relocate.

## V

### The Burden of Proof Instructions

■ Marks next contends that defense instructions Nos. 4 and 9, relating to the burden of proof, should not have been given because they conflicted with other instructions and were unduly repetitious.

As to defense instruction No. 9, Marks cannot complain now because he agreed to the instruction after the trial court struck some words to which he objected.

As to defense instruction No. 4, that instruction told the jury about the classic three part test which is a staple of discrimination law.[1] (See generally, *McDonnell Douglas Corp.* v. *Green* (1973) 411 U.S. 792 [93 S.Ct. 1817, 36 L.Ed.2d 668]; *Green* v. *Rancho Santa Margarita Mortgage Co.* (1994) 28 Cal.App.4th 686, 694-695 [33 Cal.Rptr.2d 706] [analogizing test to a game of hot potato].)

Marks claims defense instruction No. 4 conflicted with his instruction No. 6. His instruction No. 6 involved the retaliation claim. It told the jury,

---

[1]Here is the actual text:

"You are to decide whether plaintiff was the victim of employment discrimination because of his age. To establish liability for violation of age discrimination laws, plaintiff bears the burden of persuading you by a preponderance of the evidence. There is a three-part test which you must apply to determine whether or not plaintiff was the victim of unlawful discrimination:

"First, plaintiff must prove an initial case of unlawful discrimination.

"Second, if you find that plaintiff has met his burden of proving such an initial case, defendants must state a legitimate, nondiscriminatory case for its [*sic*] actions.

"Third, you must decide whether plaintiff has proved by a preponderance of the evidence that the reason offered by defendants for their actions is a mere pretext for unlawful discrimination and that, except for such unlawful discrimination, plaintiff would not have been laid off.

"The burden in this case is not on the defendants to prove that they did not discriminate. Rather, the burden is always on the plaintiff to affirmatively and ultimately prove age discrimination by a preponderance of the evidence. This requires plaintiff to prove that defendants intended to discriminate against him on the basis of his age."

among other things, that Marks "had the initial burden to establish a prima facie case of retaliation" *and* "He has done so."

The conflict argument fails because defense instruction No. 4, by contrast with plaintiff's instruction No. 6, concerned Marks's *age discrimination* claim, not his *retaliation* claim. And, by the same token, given that it addressed a different claim, it could not have been unduly repetitious either.

Marks further argues that the final paragraph of defense instruction No. 4 (see fn. 1), particularly the words "affirmatively and ultimately prove" were argumentative. Not so. In the wake of *St. Mary's Honor Center* v. *Hicks* (1993) 509 U.S. 502 [113 S.Ct. 2742, 125 L.Ed.2d 407], it is clear that, despite the "hot potato" framework of discrimination law, a plaintiff must still prove actual discrimination. (*Id.* at p. 518 [113 S.Ct. at p. 2753].) Thus, for example, it is not enough that a jury find that a defendant's articulated reason for some personnel action be false. Plaintiff must still *prove* the real reason was a discriminatory one. (*Id.* at p. 517 [113 S.Ct. at pp. 2752-2753].)[2]

## VI

### *More Supposedly Repetitious Instructions*

█ Marks next challenges defense instructions Nos. 17 and 19 as repetitious and argumentative. Defense instruction No. 17 involved personnel cutbacks: "During a reduction-in-force, an employer must often discharge qualified employees. The mere termination of a competent employee when an employer is making cutbacks for business reasons is insufficient to establish an initial case of age discrimination. In a case involving a cutback, plaintiff must come forward with additional evidence that his age, or that his prior age discrimination claim, was a factor in his layoff in order to establish an initial case."

Marks claims this instruction "gave undue influence to the defense position." Nonsense. It simply reminded the jury that Marks could not win merely by showing he was laid off.

Defense instruction No. 19 told the jury of the need to find that age discrimination or retaliation "actually played a role in defendant's decision

---

[2]As it turns out, defense instruction No. 4 should not have been given after all, but not because it was harmful to Marks to do so. The instruction hurt Loral. The question of whether a discrimination plaintiff has presented a prima facie case of discrimination is a question of law for the court. (*Caldwell* v. *Paramount Unified School Dist.* (1995) 41 Cal.App.4th 189, 201 [48 Cal.Rptr.2d 448].) Given the procedural posture of this appeal, however, the error was harmless.

to terminate his [plaintiff's] employment *and* that plaintiff's age or prior age discrimination claim had a determinative influence on that decision."[3] Marks claims that it conflicted with his mixed motives theory of liability.

The answer here is that there was no conflict. The instruction was perfectly clear that age discrimination need be merely *one* of several factors to justify a plaintiff's verdict, albeit a factor which actually made a difference ("determinative influence"). While there is a certain redundancy within the instruction itself (if something is "a factor" and plays "a role" then the implication is that it *already* has a "determinative influence"), the redundancy is so subtle, and countered by the defendant's right to instruct the jury that age discrimination must indeed make a difference, that we cannot say there was any error, much less prejudicial error. It is undisputed that Marks was able, in the portion of his own instruction No. 3 which was given, to tell the jury that he should prevail if age discrimination "played *a* motivating part" of any adverse employment decision.

## VII

### *The No-Duty-to-Transfer Instruction*

We now come to a variation on Marks's argument from part IV, *ante*, of this opinion. Not only was it error not to give his instruction on the duty to transfer issue, but, he claims, it was error to give the defense's instruction on the subject.

Defense instruction No. 15 simply stated, "An employer has no duty to transfer or 'place' an employee scheduled for layoff to an available position elsewhere in the company." Again, Marks's error here is to assume that he showed that Loral had undertaken an *obligation* to transfer laid-off employees because it made services available to *help* them find a job within the company. As given, the instruction was thus perfectly correct.

---

[3]Here is the complete text: "In order for plaintiff to establish his claim against defendant, he has the burden of proving by preponderance of the evidence that his age or prior age discrimination claim was a motivating factor in defendant's decision to terminate plaintiff's employment. Plaintiff must prove by preponderance of the evidence both that his age or prior age discrimination claim actually played a role in defendant's decision to terminate his employment *and* that plaintiff's age or prior age discrimination claim had a determinative influence on that decision." (Original italics.)

## VIII

### *The No-obligation-to-train-or-retrain Instruction*

What we have just said applies just as much to Marks's claim that it was error to give defense instruction No. 14, which covered job training, as distinct from job transfer. Defense instruction No. 14 told the jury, "An employer has no obligation to train or retrain an employee in order to make him as qualified as other employees. Thus, when plaintiff claims that younger employees were hired or retained instead of him, plaintiff must prove that he was as qualified to perform the service as those other employees, without any additional training." Again, it does not follow that because an employer may not discriminate in choosing who gets to enter a job training program that an employer *must* set up a job training program in the first place. Nor does it follow that because a large corporate employer gives help to laid-off employees that it has an obligation to give that *help* in the first place. There was no error in the instruction.

## IX

### *The Salary Instruction*

 The court instructed the jury that: "An employer is entitled to choose employees with lower salaries, even though this may result in choosing younger employees. If the choice is based on salary, there is no age discrimination." Marks now argues that the salary instruction was error because of the "high correlation" between age and salary.[4] He raises the spectre that if the law allows employers to make decisions on the basis of *salary*, many age discrimination claims are simply going to disappear.

We will begin our analysis by granting, for the sake of argument, Marks's premise that there *is* a "high correlation" between compensation and age *generally*, so that compensation based decisions would have a disparate impact on older workers *generally*. Commentators of various persuasions

---

[4]While Marks did not present facts showing "disparate impact" at trial, his argument as presented in his opening brief, based as it is on a "correlation," nevertheless requires us to consider the application of the disparate impact *doctrine* in the context of alleged age discrimination. There is no way we can address Marks's contention that the jury instruction was an "inaccurate and misleading statement of the law" in light of his proffered theory that "[i]f the given instruction were considered proper, it would eliminate the vast majority of age discrimination cases from ever being prosecuted" without doing so.

have accepted the premise,[5] as have a number of federal courts in the specific facts of cases before them.[6]

We would be remiss, though, not to note that the proffered high correlation is somewhat simplistic, and perhaps even itself a reflection of a stereotype. Census bureau statistics, for example, show a *decline* in income for older workers who reach a certain age.[7]

As we have mentioned, there is no consensus in the federal courts on the question. An employer's decision based on salary which disproportionately affected older workers because of the high correlation between age and salary would be actionable age discrimination under a number of relatively earlier federal circuit court decisions (see authorities collected in *Caron* v. *Scott Paper Co.* (D.Me. 1993) 834 F.Supp. 33, 36) as well as a few later ones. (See *Camacho* v. *Sears, Roebuck de Puerto Rico, supra,* 939 F.Supp. 113.)[8] On the other hand, federal courts which have examined the issue more recently, particularly in the wake of the United States Supreme Court's

[5]E.g., Comment, *Disparate Impact in the Age Discrimination in Employment Act: Will the Supreme Court Permit It?* (1995) 1995 Wis. L.Rev. 507, 510 ("neutral cost criteria often correlate with age"); Kaminshine, *The Cost of Older Workers, Disparate Impact, and the Age Discrimination in Employment Act* (1990) 42 Fla. L.Rev. 229, 232 ("Seniority and longevity often influence salary and fringe benefit levels. Because these factors correlate with age, older workers can become more costly to compensate than their younger counterparts."); Note and Comment, *"Overpaid" Older Workers and the Age Discrimination in Employment Act* (1996) 71 Wash. L.Rev. 769, 782-783 ("The sheer number of cases involving highly paid older workers who alleged that they were fired or not hired because of their salary argue for close examination of the issue.").

[6]E.g., *Geller* v. *Markam* (2d Cir. 1980) 635 F.2d 1027, 1033 ("we agree with Judge Blumenfeld's finding that the high correlation between experience and membership in the protected age group . . . would render application of the 'sixth step' policy discriminatory as a matter of law"); *Rose* v. *Wells Fargo & Co.* (9th Cir. 1990) 902 F.2d 1417, 1423 (after "a statistical analysis of Well Fargo's employment decisions" an expert concluded that "the single most important factor in predicting retention or termination" in a certain division of the bank or at the vice-presidential level "was age"); *Camacho* v. *Sears, Roebuck de Puerto Rico* (D.P.R. 1996) 939 F.Supp. 113, 115, fn. 2 & 123 (because plaintiff showed a disproportionate impact on older workers of across-the-board imposition of new salary structure, summary judgment was not available for defendant employer).

[7]*Metz* v. *Transit Mix, Inc.* (7th Cir. 1987) 828 F.2d 1202, 1217-1218 (dis. opn. of Easterbrook, J.). At least for the moment, the view of the dissent in *Metz* has prevailed. The dissent's position was explicitly adopted in *Anderson* v. *Baxter Healthcare Corp.* (7th Cir. 1994) 13 F.3d 1120, 1125-1126.

[8]*Camacho* is a not a pure disparate impact case, however. In that case there was some evidence of actual age animus independent of any impact which an across-the-board salary restructuring may have had on Sears's older workers. Specifically, one declaration (which precluded summary judgment in favor of the employer) indicated that the employer periodically instituted salary restructures *just* to get rid of older workers because they were *older*, not necessarily because they were *higher paid*. (See 939 F.Supp at p. 115 [Plaintiff declared that she was led to believe by two Sears managers that "Sears regularly instituted such dramatic salary restructurings in order to induce the older employees to resign."].)

decision in *Hazen Paper Co.* v. *Biggins, supra,* 507 U.S. 604, have tended to hold that economic decisions do not give rise to liability for age discrimination, despite the disparate impact of such decisions on older workers. (See *Ellis* v. *United Airlines, Inc.* (10th Cir. 1996) 73 F.3d 999, 1009 ["of those courts that have considered the issue since *Hazen,* there is a clear trend toward concluding that the ADEA does not support a disparate impact claim"].) (We discuss the impact of *Hazen Paper* on this case below.)

The core of the split may be traced to two fundamentally differing views about the goal of the age discrimination statutes. If the goal of the age discrimination statutes is to preclude decisions based on *generalities* about older workers which may have no basis as to *individuals,* then they certainly do not extend to decisions based on relative compensation rates between individual workers.[9] In this view, age discrimination statutes were enacted to prevent employers from assuming that just because an individual attained a certain age, he or she no longer could do the job, or do it as well.

The other view is that age discrimination statutes were enacted to protect older workers because of their *status* as older workers, since older workers, *generally speaking,* face unique obstacles late in their careers. Age discrimination law is thus seen as a kind of protective legislation designed to improve the lot of a people who are vulnerable *as a class.* If this view is correct, then holding that decisions based solely on salary may contravene laws precluding discrimination based on age makes sense.[10]

Three reasons demonstrate the former view should prevail: (1) the text of both the federal and state statutes indicates that price-based decisions are not within their ambit; (2) the legislative history is devoid of any intent to impose disparate impact analysis on age discrimination claims rooted in compensation differentials in either set of statutes; and, in fact, indicates an

---

[9]The position was probably best articulated by the dissent in *Metz:* "The Act prohibits adverse personnel actions based on myths, stereotypes, and group averages, as well as lackadaisical decisions in which employers use age as a proxy for something that matters (such as gumption) without troubling to decide employee-by-employee who can still do the work and who can't." (*Metz* v. *Transit Mix, Inc., supra,* 828 F.2d at p. 1213 (dis. opn. of Easterbrook, J.).)

[10]See Comment, *Disparate Impact in the Age Discrimination in Employment Act: Will the Supreme Court Permit It?, supra,* 1995 Wis. L.Rev. at page 521 ("the law's stated purpose of protecting older workers . . . . the ADEA's stated policy goal of protecting workers from the obstacles they face competing in the labor market late in their careers"); see also Kaminshine, *The Cost of Older Workers, Disparate Impact, and the Age Discrimination in Employment Act, supra,* 42 Fla. L.Rev. at page 257 (proponents of a certain view of the age discrimination statutes "would point . . . to indications that the Act was passed, in part, out of concern that unemployed older workers face unique obstacles in finding employment late in their careers").

opposite intention; and (3) disparate impact analysis, properly understood, is fundamentally inapplicable to age discrimination claims based on compensation differentials.

## A

*First, the texts of the federal and state statutes show an intention that price-based business decisions should not be held to constitute illegal age discrimination.*

### 1

### The Federal Statute

One of the important things about the federal age discrimination law is that it contains an explicit statement that an action based on "reasonable factors other than age" is not illegal age discrimination. (See 29 U.S.C. § 623(f)(1).)[11] There is no counterpart to the statement in title VII of the 1964 Civil Rights Act. (See Note, *Age Discrimination and the Disparate Impact Doctrine* (1982) 34 Stan.L.Rev. 837, 845 ["There is no provision in Title VII equivalent to ADEA section 4(f)(1)"]; cf. *Washington* v. *Gunther* (1981) 452 U.S. 161, 170 [101 S.Ct. 2242, 2248, 68 L.Ed.2d 751] [rejecting reasonable factor defense in *title VII* case].)

We must note in passing (because it is necessary in order to make sense of certain court decisions and federal regulations) that the presence of the express exception for "reasonable factors other than age" presents a problem for those who would try to divine a tidy model of the law on this point. Does the *specific mention* of "reasonable factors" mean that they constitute an *exception* to a general rule that disparate analysis is *normally* applicable to age discrimination claims? Or does the mention mean that the lawgivers simply wanted to make *doubly sure* that courts would not end up second-

---

[11]29 United States Code section 623(f)(1) provides in pertinent part: "It shall not be unlawful for an employer . . . [¶] to take action otherwise prohibited . . . where the differentiation is based on reasonable factors other than age." The provision is sometimes referred to by the shorthand acronym "RFOA." (E.g., Comment, *Disparate Impact in the Age Discrimination in Employment Act: Will the Supreme Court Permit It?, supra,* 1995 Wis. L.Rev. at p. 513.) We will use the English "reasonable factors." The last thing civil rights law needs is another Pentagonesque acronym. (Cf. *ibid.* [noting the "BFOQ" and "RFOA" exceptions to the "ADEA"].)

guessing bona fide business decisions under the guise of the age discrimination laws? For purposes of this case, we need not decide.[12] A differentiation based on salary is as "reasonable" a factor as is imaginable in a market economy.[13]

Unlike other facially neutral factors which might fall disproportionately on older workers,[14] decisionmaking by cost—reliance on relative prices if you will—goes to the very core of the operation of a market economy. (*United States* v. *Socony-Vacuum Oil Co.* (1940) 310 U.S. 150, 226, fn. 59 [60 S.Ct. 811, 845, 84 L.Ed. 1129] [price fixing banned because of "actual or potential threat to the central nervous system of the economy"]; see also *Fisher* v. *City of Berkeley* (1984) 37 Cal.3d 644, 717 [209 Cal.Rptr. 682, 693 P.2d 261] (dis. opn. of Lucas, J.) ["Price fixing, whether privately or publicly inspired, thus endangers the free economic system to which Congress has entrusted the prosperity of the entire nation."].)

All pricing, of course, results in "discrimination." Buyers "discriminate" against brand X when they purchase the cheaper brand Y *because* brand Y is cheaper. Compensation levels are nothing more than the price of individual services in the labor market. Prices, both in terms of what is paid for and what is received, go to the very core of operating any enterprise, be it profit, nonprofit, or governmental.

---

[12]One case has suggested that the latter view is the better one, because otherwise it would mean that a prima facie case of age discrimination could be established anytime an employer made an across-the-board cut in wages. (See *Finnegan* v. *Trans World Airlines, Inc.* (7th Cir. 1992) 967 F.2d 1161, 1165 ["We could accept the plaintiff's approach to the extent of finding a disparate impact, and then rule that the employer's business justification was compelling. But that would not be a satisfactory approach. It would mean that every time an employer made an across-the-board cut in wages or benefits he was prima facie violating the age discrimination law. Practices so tenuously related to discrimination, so remote from the objectives of civil rights law, do not reach the prima facie threshold."].)

In any event, it would be a classical error of circular logic to conclude, as the federal district court did in *Camacho* (see 939 F.Supp. at pp. 122-123), that the existence of EEOC regulations taking the position that disparate impact analysis is the rule require that such analysis be applied to decisions based on salary differentials. The *reason* for the regulations was the *specific exception* for reasonable factors, so even if disparate impact analysis is the rule, one must still ascertain whether price-based decisions fall within the exception. (See also our discussion of *Camacho* in fn. 17, *post*.)

[13]In 1991 Congress added a disparate impact cause of action to title VII of the Civil Rights Act of 1964, but added no parallel provision to the Age Discrimination in Employment Act. (See *Ellis* v. *United Airlines, Inc., supra,* 73 F.3d at p. 1008.) The Tenth Circuit *Ellis* court thought the omission indicative of congressional intent (see *ibid.*), while the federal district court in *Camacho* dismissed the point as a "makeweight" because the issue of disparate impact in age discrimination cases was not on Congress' agenda at the time. (See *Camacho* v. *Sears, Roebuck de Puerto Rico, supra,* 939 F.Supp. at p. 120.) The important thing from our point of view is that the reasonable factor language in 29 United States Code section 623 was unaffected by the 1991 legislation.

[14]Suppose, for example, that an employer had a rule against hiring anyone whose natural hair color was gray, or who was bald or balding.

An objection to the use of price as a "reasonable factor" is that profitability has not been allowed to justify discrimination in other civil rights contexts. (E.g., *Wilson* v. *Southwest Airlines* (N.D.Tex. 1981) 517 F.Supp. 292, 304 [struggling airline could not restrict flight attendant jobs to females despite evidence that restriction was vital to airline's marketing campaign].) Such cases have given rise to what some commentators call the "Anti-Cost Rule Under Title VII." (E.g., Kaminshine, *The Cost of Older Workers, Disparate Impact, and the Age Discrimination in Employment Act, supra*, 42 Fla. L.Rev. 229, 240.)

Salary differentials, however, present a matter qualitatively different from the usual disparate impact situation in a title VII context. An action based on price differentials represents the very quintessence of a legitimate business decision. "In a for-profit enterprise," wrote Judge Gary Taylor in a recent federal decision, ". . . the essence of employment decisions is whether an employee's salary is justified by that employee's productivity." (*U.S. E.E.O.C.* v. *Newport Mesa Unif. Sch. Dist.* (C.D.Cal. 1995) 893 F.Supp. 927, 932.) As the dissent pointed out in the *Metz* case, "wages correspond precisely to the costs of doing business, and hence to profitability." (*Metz* v. *Transit Mix Inc., supra*, 828 F.2d at p. 1219 (dis. opn. of Easterbrook, J.).) And, as one law review commentator has noted—and we think the proposition is irrefutable—"Cost-based layoffs often constitute perfectly rational business practices, grounded in employers' concern for economic viability." (Comment, *Disparate Impact in the Age Discrimination in Employment Act: Will the Supreme Court Permit It?, supra*, 1995 Wis. L.Rev. at p. 510.)

Decisions based on salary therefore must, as Justice Rehnquist said in his dissent from the denial of a hearing of an early Second Circuit decision, come within the "reasonable factors other than age" language of the federal age discrimination statute. (See *Markam* v. *Geller* (1981) 451 U.S. 945 [101 S.Ct. 2028, 68 L.Ed.2d 332] (dis. opn. of Rehnquist, J.).)[15]

---

[15]The same principle which protects the goose protects the gander in other contexts. Justice Rehnquist argued that the error of the intermediate appellate court in *Geller* was to apply an EEOC regulation (29 C.F.R. former § 860.103(h) (1979))—to the effect that an employer cannot refuse to hire an older worker because the "average cost of employing older workers as a group" is higher—to a case where a school district had a policy of recruiting teachers below a salary step level reached by teachers with more than five years' experience. The application of the regulation may have been wrong, but the idea *behind* the regulation as worded is perfectly sensible. Just as an employer is free to make decisions based on salary even though those decisions have a disproportionate effect on older workers generally, so is an employer not free to blanketly refuse to hire an individual older worker because older workers are *generally* more highly compensated. Both Rehnquist's dissent and the regulation are consistent in abhorring the application of generalized stereotypes to real, live, flesh-and-blood human beings.

The main "textual" argument which is advanced against the use of salary in the context of age discrimination claims is the phrase "otherwise adversely affect" as it appears in the federal age discrimination statute, 29 United States Code section 623(a)(2).[16] Some courts have concluded that the phrase means " 'any policy having a more harmful effect on older people than on their co-workers.' " (*Camacho* v. *Sears, Roebuck de Puerto Rico*, *supra*, 939 F.Supp. 113, 120; *Caron* v. *Scott Paper Co.*, *supra*, 834 F.Supp. at pp. 37-38 ["The phrase . . . implies that an employment practice may constitute illegal discrimination even if not intended or directed specifically at age."].)

There are two flaws in the "adversely affect" argument. The first is that it is based on a grammatically nonsensical reading of the federal text. (The complete text is set out in footnote 16, *ante*.) Admittedly, the statute was not written by Hemingway. Nevertheless, it is not so convoluted that it cannot be understood. The text does *not* say, "It shall be unlawful for an employer— . . . to otherwise adversely affect an employee because of such individual's age." It says, "It shall be unlawful for an employer to limit, segregate or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect *his status as an employee*, because of such individual's age." (Italics added.) We emphasize the words "his status as an employee" because those words show that the words "adversely affect" pertain to the verbs "limit, segregate or classify," and do not stand on their own. To read the phrase the way the *Camacho* and *Caron* courts did would mean that the "his" in the phrase, "his status as an employee," would refer to the *employer*, which makes no sense at all. The words "adversely affect" refer to actions which "affect" an employee's "status as an employee" *because of* "such individual's age."

The second flaw in the adverse affect argument is that it ignores the balance of the language from the federal age discrimination statute, all of which contradicts the idea that the statute was enacted to provide special protection for older workers as a group. In fact, the balance of the language favors the idea that the statute was enacted to protect *individuals* from being discriminated against *because* of *their* age, not because they share a characteristic with a protected class. The word "individual" appears no less than five times in the course of one sentence, delineating the nature of age discrimination. Here is the complete text of 29 United States Code section 623(a):

"It shall be unlawful for an employer— [¶] (1) to fail or refuse to hire or to discharge *any individual* or otherwise discriminate against *any individual*

---

[16]29 United States Code section 623(a)(2) provides, in its entirety: "It shall be unlawful for an employer— [¶] . . . [¶] (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age."

with respect to his compensation, terms, conditions, or privileges of employment, *because* of *such individual's age*; [¶] (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive *any individual* of employment opportunities or otherwise adversely affect his status as an employee, *because* of *such individual's age*; or [¶] (3) to reduce the wage rate of any employee to comply with this Act." (Italics added.)

The theme of this language is the protection of individuals from discrimination *because* of their age, not the protection of "older workers" by virtue of their status as older workers. The surrounding context of the phrase "adversely affect" deals with the impact of the "adverse" decision on *"any individual."*[17]

Such a reading of the text is confirmed by two United States Supreme Court decisions, each of which—though they have not probed the issue of disparate impact as such—have directly addressed the very nature of age discrimination as it is outlawed in the federal statutes. According to the court's unanimous decision in *Hazen Paper Co.* v. *Biggins, supra,* 507 U.S.

---

[17]It is interesting that in *Camacho* v. *Sears, Roebuck de Puerto Rico, supra,* 939 F.Supp. 113, a case in which the federal district court was required to confront the problem of the reasonable factor language in the context of an across-the-board salary restructuring, and in which the court held that such a restructuring could indeed be age discrimination, the court was unable to directly refute the obvious reasonableness of using price. The *Camacho* court never said, for example, that doing what consumers, buyers and employers have been doing from time immemorial, i.e., making decisions based on price, was unreasonable. (See *id.* at p. 122.) Rather, the court rejected the idea that an across-the-board wage reduction constituted a "reasonable factor" under 29 United States Code section 623 because (a) the EEOC had adopted the position that the "reasonable factor" language *itself* provided for disparate impact analysis (see 939 F.Supp. at p. 122), and (b) the controlling authority in the First Circuit was that disparate analysis was the rule, even though that authority predated *Hazen Paper.* (See *id.* p. 123.) As to the statements in *Hazen Paper* concerning the nature of age discrimination, the *Camacho* court merely dismissed them as "not the stuff on which a trial court may base its interpretation of the law." (*Id.* at p. 121.)

The error in *Camacho's* analysis is at least twofold. First, as we have already touched on in footnote 12, *ante,* and accompanying text, the reasonable factor language gives rise to two models as far as disparate impact analysis is concerned: The first model is that disparate impact analysis is the normal rule, but an employer can take itself outside the operation of the normal rule by showing a reasonable factor other than age. The second model is that disparate impact analysis is not the normal rule at all. *Camacho* fails to realize that, even if the first model is the correct one, the only way that one can read disparate impact analysis into the statute *because* of the "reasonable factors" exception is precisely because it is an *exception.* So even if disparate impact analysis is the "normal" rule, that does nothing to show that price-based decisions are not reasonable, particularly in the context of a market economy.

The second of the *Camacho* errors was simply to ignore the clear implication of what the Supreme Court said about the individual, as distinct from collective, focus of the age discrimination laws. *Camacho's* "not the stuff" rationale is most unconvincing—basically it amounts to a conclusory declaration that the court did not want to deal with the implications of the high court's point about the real nature of illegal age discrimination.

604, age discrimination is action based on a stereotype about *age*, not action to cut costs which has a disproportionate collateral effect on older workers. In particular, the basis of age discrimination is an "inaccurate and stigmatizing" *stereotype* of the older worker as someone who cannot *do the job* as well as a younger worker. "It is the very essence of age discrimination for an older employee to be fired because the employer believes that productivity and competence decline with old age . . . . Congress' promulgation of the ADEA was prompted by its concern that older workers were being deprived of employment based on inaccurate and stigmatizing stereotypes." (507 U.S. at p. 610 [113 S.Ct. at p. 1706].). Elsewhere, the *Hazen Paper* court stated that age discrimination is a wrong rooted in "an inaccurate and denigrating generalization about age." (*Hazen Paper Co., supra*, 507 U.S. at p. 612 [113 S.Ct. at p. 1707].)[18]

More recently, another unanimous opinion, *O'Connor v. Consolidated Coin Caterers Corp.* (1996) 517 U.S. 308 [116 S.Ct. 1307, 134 L.Ed.2d 433], reiterated the point that age discrimination is something which protects individuals, not protected groups *qua* groups. Indeed, that case required the court to directly decide the question of whether the age discrimination statutes protected individuals as individuals, or individuals as members of favored groups. The issue in *O'Connor* was whether a 56-year-old plaintiff could show a prima facie case of age discrimination even though he was replaced by someone who was *also* in the protected class (see 29 U.S.C. § 631(a)). The answer was yes—age discrimination is, to put it plainly, the act of holding an individual's age against him or her, not in doing something which has a disproportionate effect on older workers generally. The court declared: *"Because the ADEA prohibits discrimination on the basis of age and not class membership,* the fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class." (517 U.S. at p. 313 [116 S.Ct. at p. 1310], italics added.)

Another possible textual argument, albeit one which has received less attention in the cases and literature, might be built on the prohibition set forth in 29 United States Code section 623(a)(3), which states that "It shall be unlawful for an employer— [¶] . . . [¶] (3) to reduce the wage rate of any employee to comply with this Act." If an employer cannot cut costs by reducing the wages of older workers, it might be reasoned, then surely an employer cannot prefer lower paid workers when making layoff decisions.

[18]The court was thus impliedly recognizing a point made by Judge Easterbrook in his *Metz* dissent several years earlier: that the wrong prohibited by age discrimination is treating an individual as a member of a collective to which "myths, stereotypes and group averages" are applied, rather than as an individual to be evaluated on his or her own individual merit. (See *Metz v. Transit Mix, Inc., supra*, 828 F.2d 1202, 1213-1214 (dis. opn. of Easterbrook, J.).)

But the statute does not say that an employer cannot reduce wage rates *to reduce costs*. It merely forbids reducing wage rates *to comply with the age discrimination laws*. The simple and plain meaning is that an employer may not reduce an older worker's wage rate on the ground that it is *required* by age discrimination laws. The antiwage reduction provision was clearly enacted simply to prevent the passage of the age discrimination laws *themselves* from precipitating wage reductions based on the idea that pay differentials between younger and older workers had to be equalized. In that sense the provision buttresses the general theme in the text of the federal statute that workers should be considered on their individual merits, and not as members of some age cohort. Thus even courts which have concluded that use of adversely impacting salary differentials are improper have, at the same time, stated that age discrimination may be avoided by offering older workers the opportunity to work at the same job for reduced pay. (See *Rivas* v. *Federacion de Asociaciones Pecuarias* (1st Cir. 1991) 929 F.2d 814, 822; *Abbott* v. *Federal Forge, Inc.* (6th Cir. 1990) 912 F.2d 867, 876; *Metz* v. *Transit Mix, Inc., supra*, 828 F.2d at pp. 1208-1210.)

2

*The State Statute*

■ We have spent considerable time on the federal text because it has been the established practice of California courts to look to federal decisions—particularly the decisions of the United States Supreme Court—for assistance in state age discrimination cases. (E.g., *Janken* v. *GM Hughes Electronics* (1996) 46 Cal.App.4th 55, 66 [53 Cal.Rptr.2d 741] ["Because the antidiscrimination objectives and relevant wording of . . . the Age Discrimination in Employment Act (ADEA) . . . [is] similar to those of the FEHA, California courts often look to federal decisions interpreting those statutes for assistance in interpreting the FEHA." (fns. omitted)]; *Cummings* v. *Benco Building Services* (1992) 11 Cal.App.4th 1383, 1386 [15 Cal.Rptr.2d 53] ["The language, purpose and intent of California and federal antidiscrimination acts are virtually identical. Thus, in interpreting FEHA, California courts have adopted the methods and principles developed by federal courts . . . under the federal Age Discrimination in Employment Act . . . ."]; *Los Angeles County Dept. of Parks & Recreation* v. *Civil Service Com.* (1992) 8 Cal.App.4th 273, 280 [10 Cal.Rptr.2d 150] ["In employment discrimination cases, California courts have frequently adopted the standards set by the United States Supreme Court for proving intentional discrimination under title VII of the federal Civil Rights Act, 42 United States Code section 2000e et seq."]; *Stephens* v. *Coldwell Banker Commercial Group, Inc.* (1988) 199 Cal.App.3d 1394, 1399 [245 Cal.Rptr. 606] ["Because the language and

objectives of California's Fair Employment and Housing Act as it relates to age discrimination closely parallel the language and objectives of the federal Age Discrimination in Employment Act . . . we refer to federal decisions where appropriate."]; *Levy* v. *Regents of University of California* (1988) 199 Cal.App.3d 1334, 1343 [245 Cal.Rptr. 576] ["To guide us in our analysis of appellant's claim under both the FEHA and the ADEA, we look at federal law . . . ."].) Indeed, as Justice Spencer wrote more than 15 years ago in *Kubik* v. *Scripps College* (1981) 118 Cal.App.3d 544, 552 [173 Cal.Rptr. 539], California's legislative scheme "has been modeled on the federal act throughout its developing history."

 A little more explication is needed though, because of certain outward dissimilarities in the two sets of statutes. Like the federal law, California's core age discrimination statute is set out in a different code section than other antidiscrimination legislation. Federal law has its title VII and the separate Age Discrimination in Employment Act; California's Fair Employment and Housing Act prohibits most forms of discrimination in Government Code section 12940. Age discrimination, however, is covered by a separate statute, Government Code section 12941.

Government Code section 12941, subdivision (a) makes it unlawful "for an employer to refuse to hire or employ, or to discharge, dismiss, reduce, suspend, or demote, any individual over the age of 40 on the ground of age, except in cases where the law compels or provides for such action." The statute then states that it shall not be "construed to make unlawful the rejection or termination of employment where the individual applicant or employee failed to meet bona fide requirements for the job or position sought or held, or to require any changes in any bona fide retirement or pension programs or existing collective-bargaining agreements . . . nor shall this section preclude . . . physical and medical examinations . . . to determine fitness for the job."

In the next paragraph the Government Code section 12941 states that "[p]romotions within existing staff, hiring or promotion on the basis of experience and training, rehiring on the basis of experience and training, rehiring on the basis of seniority and prior service with the employer, or hiring under an established recruiting program from high schools, colleges, universities, and trade schools shall not, in and of themselves, constitute a violation" of the section.

The third and final paragraph, Government Code section 12941, subdivision (b), next states a more general exception: "This section shall not limit the right of an employer, employment agency, or labor union to select or

refer the better qualified person from among all applicants for a job." The statute ends with the imposition of the burden of proving a violation on the person claiming it occurred. The absence in the California text of the exact words "reasonable factors other than age" thus merits some discussion.

There is nothing in the language of Government Code section 12941 which directly indicates that use of salary to differentiate between employees was intended by the Legislature to constitute age discrimination if by some chance it disproportionately affected older workers as a group. Moreover, there is nothing which indicates that specific practices not otherwise enumerated may be held to constitute a violation of the statute *just because* those practices have a disproportionate impact on older workers generally.

To the degree that there is any doubt, that doubt should be resolved against any such construction, for three reasons. First, the use of price is basic to any functioning economic system, and marks the classical difference between a command and a free market economy. A law which precludes price *itself* as a decisionmaking basis is not just a run-of-the mill regulation —the kind of regulation which, say, merely adds to a price or restricts the production of certain goods. Rather, such a law, to the extent of its sphere of influence, prohibits the very operation of any kind of market. *Price* lies at the core of all economic decisionmaking. Given the absolute basic and fundamental role of prices in any viable economic system, the natural presumption is the Legislature would have plainly said that any use of price which had a disproportionate impact on workers over the age of 40 was unlawful, rather than leaving it to the courts to say so. In light of the absence of any textual basis on which to predicate liability for price-based decisions, a court should certainly not *extend* the statute to read into it attributes more appropriate to a command rather than a market economy.

Second, the focus of the California text is still on the individual worker, albeit here only one over age 40, who is being discriminated against "on the ground of age." As we have seen, similar language ("because of . . . age") has been construed by the United States Supreme Court in *O'Connor* v. *Consolidated Coin Caterers Corp., supra*, 517 U.S. at page 312 [116 S.Ct. at page 1310], to refer to discrimination against individuals, not afford protection to a class. Again, if our state Legislature had wanted to say that it is unlawful "to use in the decision regarding an individual worker a criterion which has a disproportionate impact on older workers generally," it could have said so, as we just did. It didn't.

Third, while "reasonable factors other than age" does not appear in the text, an equivalent does: the right of the employer to choose "the better

qualified person from among all applicants." While the phrase "better qualified" naturally applies to the individual qualifications such as skills, experience and ability, it would be unrealistic to confine the idea of qualification to *just* those things. Marketplace reality, as every consumer knows, is based on value—the *combination* of quality and price. It is not possible to divorce the ability to do a job from the wage demanded. (See *Metz* v. *Transit Mix Inc., supra*, 828 F.2d at p. 1213 (dis. opn. of Easterbrook, J.).) To use an example from the *Metz* dissent: A welder may be good enough to work on simple sheet metal at $10 an hour, but not good enough to work on a bridge at $30. "In business the question is not 'is Jones qualified?' but 'can Jones do the job well enough to cover his wage?' . . . There is no 'qualified welder' in the abstract." (*Ibid.*)[19]

B

*Second, the intent of the federal and state age discrimination statutes was to prevent employers from basing decisions on generalities, not to prevent employers from making perfectly sound economic decisions which have a disproportionate effect on older workers as a group.*

1

*The Federal Statute*

■ The idea that a disproportionate effect on a group can be discriminatory is judge made, originating in the 1971 decision in *Griggs* v. *Duke Power Co.* (1971) 401 U.S. 424 [91 S.Ct. 849, 28 L.Ed.2d 158]. (See Gelb & Frankfurt, *California's Fair Employment and Housing Act: A Viable State Remedy for Employment Discrimination* (1983) 34 Hastings L.J. 1055, 1068 ["The second theory, disparate impact, is wholly court-developed."].) Since the disparate impact doctrine was developed after the enactment of the federal age discrimination statute, that history, not surprisingly, does not exactly radiate an intent to outlaw practices merely because they have a disproportionate impact on older workers. What is remarkable, though, is the degree to which the legislative history eschews any attempt to establish liability for otherwise neutral, price-based decisions.

The legislative history of the federal statute has been set out in *EEOC* v. *Wyoming* (1983) 460 U.S. 226, 229-233 [103 S.Ct. 1054, 1056-1059, 75

---

[19]One commentator has noted courts of law, unlike private employers, are generally not faced with the consequences of incorrect decisions, and so may not be appropriately sensitive to the needs of employers in a competitive economy to hire the "optimum" person. (See Schuman, *The Politics of Presumption: St. Mary's Honor Center* v. *Hicks and the Burdens of Proof in Employment Discrimination Cases* (1993) 9 St. John's J. Legal Comment. 67, 89.) The point is all the more reason for courts to take a realistic view of the phrase "better qualified" as it appears in the statute.

L.Ed.2d 18]. Essentially, rather than include age within the Civil Rights Act of 1964, Congress commissioned the Secretary of Labor to do a report.

The report, entitled, The Older Worker: Age Discrimination in Employment, Report of the Secretary of Labor to the Congress Under Section 715 of the Civil Rights Act of 1964 (hereafter, Labor Secretary's Report), was issued in June 1965. The salutation to Vice-President Hubert H. Humphrey and House Speaker John W. McCormack notes that it was based on "special studies" conducted in response to the 1964 congressional directive, as well as "extensive research done earlier, including the work of the President's Council on Aging."

The report itself is a remarkably readable and poetic document for something published by the United States Government Printing Office. It opens with lines from Browning, " 'The best is yet to be / The last of life, for which the first was made' " and closes with lines from Tennyson, " 'Knowledge comes, but wisdom lingers,' " and along the way manages to work in some references to Frost and H. G. Wells, as well as some very lilting phrases of its own. (See Labor Secretary's Rep., *supra*, at p. 1 [". . . a new age of man . . . the perfectibility of life with the human competence . . . life's bruising mystery . . . ."].) The Labor Secretary's Report is, in many ways, a meditation of the problem of age and employment.

After its poetic opening, the Labor Secretary's Report settles down to make several points relevant to understanding the intent behind the federal age discrimination statute. First—a point made with particular rhetorical strength in the introduction—is the *absence* of a parallel with other kinds of discrimination. One cannot just extrapolate the law of, say, race discrimination to the problem of age discrimination; the report specifically declares that to do so would be wrong.[20] Old age is, after all, "one minority group in which we all seek, sometimes desperately, eventual membership." (Labor Secretary's Rep., *supra*, at p. 3.)

Structurally, the report subdivides factors which "[m]ight tend to [r]esult in discrimination [b]ecause of [a]ge" into four groups: (1) discrimination arising from dislike or intolerance; (2) arbitrary discrimination; (3) the forces of certain "circumstances," and (4) "[i]nstitutional [a]rrangements that [i]ndirectly [r]estrict the [e]mployment of [o]lder [w]orkers." (See Labor

---

[20]The Labor Secretary's Report states at page 1: "The Nation has faced the fact—rejecting inherited prejudice or contrary conviction—that people's ability and usefulness is unrelated to the facts of their race, or color, or religion, or sex, or the geography of their birth. Having accepted this truth, the easy thing to do would be simply to extend the conclusions derived from it to the problem of discrimination in employment based on aging, and be done with the matter. *This would be easy—and wrong.*" (Italics added.)

Secretary's Rep., *supra*, at pp. 5-15.) The report quickly dispenses with the first set: Essentially there was, in 1965, not enough dislike or intolerance of older workers to even "warrant public concern." (See Labor Secretary's Rep., *supra*, at p. 6.)

Of the other three sets of factors, the second, arbitrary discrimination, is defined essentially as an application of an age limit "without consideration of a particular applicant's individual qualifications." (Labor Secretary's Rep., *supra*, at p. 6.) The third factor, "circumstances," involves the impact of technological change and location of industry as it affects older workers, which the report saw (in 1965, one must remember) as disproportionately undereducated and immobile. Thus much of the section is devoted to the problem of older workers in smokestack industries who are laid off when those industries relocate, and the need for such workers to retrain to meet "technological changes."[21] This portion of the report, however, carries through with the theme of the need to judge workers on an individual rather than group basis. After reviewing certain evidence showing wide individual variation within every age group in productivity, the report concludes that "These findings show the injustice of judging workers by the average for the group rather than on the basis of their individual abilities." (*Id.* at pp. 14-15.)

The final set of factors concerned "[i]nstitutional [a]rrangements" which "[i]ndirectly [r]estrict" the employment of older workers. To the degree that the report addresses the issue of compensation differentials, it does so in this section. Ironically, however, the focus of this portion of the report is nowhere concerned with the disproportionate effect on higher paid older workers when layoff decisions are made based on salary, but on the reluctance of employers to consider older workers for lower and entry-level jobs.[22] The Secretary further stated, in a single two-paragraph section, that requiring workers' compensation coverage where there is a preexisting condition (such as arthritis or other degenerative diseases) meant some employers had become reluctant to hire older workers. Noting that "[n]either the operation of the workmen's compensation laws nor of the unemployment insurance systems can be expected to lessen employer concern about such costs," the Secretary characterized the problem of one of a "gap in coverage

---

[21]There is a certain irony in the 1965 report's focus on the problem of older industry, technological progress, and older, less educated and immobile workers. Age discrimination claims are often brought by highly educated workers in Sunbelt-based high-tech industries.

[22]Under the heading of personnel policies which establish "an orderly system for assignment and promotion of already employed workers," the text states: "Starting the older worker at a low-level job involves not only age balance, but questions of pay. For the experienced worker an entry job often means a reduction in earnings level. Resistance to such cuts in earnings has been found to limit reemployment opportunities in several case studies of displaced workers." (Labor Secretary's Rep., *supra*, at p. 15.)

for disabilities that are not job related." (Labor Secretary's Rep., *supra*, at pp. 15-16.) The report similarly pointed out that pension, health and insurance plans could discourage employers from hiring older workers, because funding plans for such workers could cost more. (See *id.* at p. 16.) However, the Secretary then went on to point out that portability of pension rights and vesting requirements could narrow the "cost advantage" that otherwise favored younger workers. (*Id.* at p. 17.)

Besides identifying four factors bearing on the problem of discrimination against older workers (of which three were thought to be worthy of some governmental action), Secretary Wirtz recommended "four types of programs." The four recommendations do not exactly correspond to the four problems, but—significant in understanding the Secretary's intent—the problems of "[a]rbitrary [a]ge [d]iscrimination" and "institutional arrangements which work to the disadvantage of older workers" each get their own set of recommendations.[23] The Secretary called for a *statutory* means to combat arbitrary age discrimination. (See Labor Secretary's Rep., *supra*, at pp. 21-22.) The idea was to promote "a national policy with respect to hiring on the basis of ability rather than age." (*Id.* at p. 22.)

But the report did not call for a statutory solution to the problem of institutional arrangements which *indirectly* work to the disadvantage of older workers. Rather, the Secretary proposed four things: portable pension credits, new forms of annuity coverage to *reduce the cost* of hiring older workers, further review of the existing workers' compensation and disability insurance systems, and the development of methods in collective bargaining to "open opportunities for hiring unemployed workers with long industrial service" but at the same time protecting existing seniority rights. (Labor Secretary's Rep., *supra*, at p. 22.)

Additionally, the Secretary proposed programs to increase the opportunities for older workers (such as job counseling, job-finding programs, and retraining, see Labor Secretary's Rep., *supra*, at p. 23) plus encourage older workers to return to school. (See *id.* at pp. 24-25 ["The time when a person could, before he was sixteen or eighteen, acquire a set of skills, or ideas, and make do with them for life, is gone."].)

We have explained the Labor Secretary's Report in considerable detail, not only because it is—to the degree that the statutory text is ambiguous—

---

[23]The report states in part II, conclusions and recommendations: "Such an effort will include four types of programs. [¶] First: *Action* to eliminate arbitrary age discrimination in employment. [¶] Second: *Action* to adjust institutional arrangements which work to the disadvantage of older workers. [¶] Third: *Action* to increase the availability of work for older workers. [¶] Fourth: *Action* to enlarge educational concepts and institutions to meet the needs and opportunities of older age." (Labor Secretary's Rep., *supra*, at p. 21, original italics.)

the best indicia outside the statutory text of what Congress intended when it enacted the age discrimination statutes—but to show that the document which originated the federal age discrimination statute, if actually read, supports the commonsense proposition that the age discrimination statutes were never intended to ·prohibit employers from making price-based decisions.

As we have noted, Secretary Wirtz called for a statutory prohibition against "arbitrary age discrimination," not against factors which "indirectly" work to the disadvantage of older workers. More importantly, the Labor Secretary implicitly recognized the legitimacy of market and price-based decisions in his discussion of pensions, insurance and worker compensation costs. His remedy, significantly, was not to suppress the magic of the marketplace, but to develop measures consistent with a market economy by ameliorating cost differentials (or studying ways to ameliorate those cost differentials). (See Labor Secretary's Rep., *supra*, at p. 22.)

Cases holding to the contrary have simply given the Labor Secretary's Report superficial treatment. The post-*Hazen* decision in *Caron* v. *Scott Paper Co.*, *supra*, 834 F.Supp. 33, gave only the most superficial, conclusory treatment to the legislative history of the federal age discrimination statutes. (See *id.* at p. 38 [stating it reviewed the report and found no references to, as the unsuccessful defendant had characterized it, " 'employment practices which quite unintentionally lead to age limits' "].)[24] The post-*Hazen* decision in *Camacho* v. *Sears Roebuck de Puerto Rico*, *supra*, 939 F.Supp. 113, simply brushed off the legislative history as being "hardly dispositive" of the debate. (See *id.* at pp. 120-121.)

The Labor Secretary's Report is also crucial to understanding the preamble to the federal act. (See 29 U.S.C. § 621.) The preamble is structured by four findings, followed by a statement of what the act seeks to do. As to the findings, it notes that ". . . in the face of rising productivity and affluence, older workers find themselves disadvantaged in their efforts to retain employment and regain employment when displaced from jobs." (29 U.S.C. § 621(a)(1).) The preamble next finds the existence of "arbitrary age limits" has become a "common practice." (29 U.S.C. § 621(a)(2).) The preamble then says that "certain otherwise desirable practices may work to the disadvantage of older persons." (*Ibid.*) Consequently, there is disproportionately

---

[24]The *Caron* court's error is the classic fallacy of trying to prove one's point by tearing down a straw figure. *Caron* simply excerpted a phrase from a litigant's argument, then reviewed the report and announced that because it did not find any reference to that exact phrase in the report, the litigant's argument was "unpersuasive." (See 834 F.Supp. at p. 38.) The *Caron* court gave no indication that it ever considered the different programs proposed for "arbitrary age discrimination" and "institutional arrangements."

higher unemployment among older workers. (29 U.S.C. § 621(a)(2)-(3).)[25] The preamble ends by finding that arbitrary discrimination in "industries affecting commerce" has the effect of itself "burden[ing] commerce and the free flow of goods in commerce."

One might derive from the phrase "certain otherwise desirable practices" the thought that compensation differentials were intended. What is clear from the Labor Secretary's Report, is that Congress meant no such thing. The report's discussion of institutional arrangements on pages 15 through 17 shows that Congress meant the very existence of standardized personnel policies, seniority systems, broad coverage under workers' compensation laws, and private pension, health and insurance plans—all good things, the Labor Secretary said, but which could have the unintended effect of discouraging the reemployment of older workers. (See Labor Secretary's Rep., *supra*, at p. 15.)

Moreover, it is also significant that the preamble, consistent with the Labor Secretary's Report (see Labor Secretary's Rep., *supra*, at pp. 18-20 [consequences on the national economy]), stresses the free flow of commerce. The free flow of commerce is never promoted by outlawing the very mechanism—price—by which transactions are conducted in the marketplace. Like the Labor Secretary's Report, the preamble to the federal age discrimination laws stresses solutions within the confines of the operation of the free market, not in direct contradiction to it.

2

*The State Statute*

California's age discrimination statute predates the federal. California has had an age discrimination statute since 1961, when former Unemployment Insurance Code section 2072 was enacted as part of a chapter entitled, Employment of Older Workers. (*Jennings* v. *Marralle* (1994) 8 Cal.4th 121, 130-131 [32 Cal.Rptr.2d 275, 876 P.2d 1074].) The current statute, Government Code section 12941, may be traced back to the 1961 legislation. Basically, the statute began in the Unemployment Insurance Code (see Stats. 1961, ch. 1623, § 1, p. 3518), was transferred to the Labor Code in 1972 (see Stats. 1972, ch. 1144, § 1, p. 2211) and then in 1980 was placed in the Government Code (see Stats. 1980, ch. 992, § 4, p. 3140.)

Interestingly enough, the statement of purpose behind the original legislation has survived to this day, remaining in effect as Unemployment

---

[25]The word "disproportionate" is not used. The text of 29 United States Code 621(a)(3) speaks of "the incidence of unemployment" being *"relative* to the younger ages, high among older workers . . . ." (Italics added.)

Insurance Code section 2070.[26] That statement of purpose reflects the same themes we have already covered. (Cf. *Kubik* v. *Scripps College, supra*, 118 Cal.App.3d at p. 552 ["The goals of the state and federal acts are presumptively the same."].) The purpose of prohibiting age discrimination is to eliminate, in the words of the statute, the "rigid and unsound rules that operate to disqualify significant portions of the population from gainful and useful employment." In other words, the statute was to cover what the Labor Secretary's Report characterized as "arbitrary discrimination," not the normal operation of a business. Moreover, what is targeted is not practices which simply have a disproportionate impact, but "arbitrary and unreasonable rules which bar or terminate employment on the ground of age." As we have seen, the normal preference of businesses, consumers and even government agency department heads not to pay any more money than necessary for goods or services is anything but arbitrary and unreasonable.

Nothing in the regulations promulgated by California's Fair Employment and Housing Commission conflicts with our conclusion. Those regulations specifically make "business necessity" a defense to an employment discrimination claim even where "an adverse impact" is otherwise shown.[27] As noted above, making decisions based on price difference—which is nothing less than what every consumer does in the free market—is as "overriding legitimate business purpose" as is imaginable.[28]

---

[26]The statute provides in its entirety: "It is the public policy of the State of California that manpower should be used to its fullest extent. This statement of policy compels the further conclusion that human beings seeking employment, or retention thereof, should be judged fairly and without resort to rigid and unsound rules that operate to disqualify significant portions of the population from gainful and useful employment. Accordingly, use by employers. employment agencies, and labor organizations of arbitrary and unreasonable rules which bar or terminate employment on the ground of age offend the public policy of this State." (Unemp. Ins. Code, § 2070.)

[27]The complete text of title 2, California Code of Regulations, section 7286.7, subdivision (b) is: "Where an employer or other covered entity has a facially neutral practice which has an adverse impact (i.e., is discriminatory in effect), the employer or other covered entity must prove that there exists an overriding legitimate business purpose such that the practice is necessary to the safe and efficient operation of the business and that the challenged practice effectively fulfills the business purpose it is supposed to serve. The practice may still be impermissible where it is shown that there exists an alternative practice which would accomplish the business purpose equally well with a lesser discriminatory impact." (See also Cal. Code Regs., tit. 2, § 7287.4, subd. (a) ("Any policy or practice of an employer or other covered entity which has an adverse impact on individuals on a basis enumerated in the Act is unlawful unless the policy is job related . . . .").)

Thus, as noted in footnote 12, *ante*, in the analogous context of EEOC regulations, even if disparate impact is the rule and business necessity is the exclusion, decisions based on price differentials necessarily fall within the exception.

[28]As written, the state regulations place the burden on the employer to show business necessity. The question of whether the employer here actually carried that burden is not

# C

*The first principles of "disparate impact analysis," as articulated by the United States Supreme Court, do not apply to differentiations based on salary.*

■ Because legal ideas are necessarily expressed in words, they sometimes take on a life of their own independent of their origins or intentions. Marks's argument suggests that such a process has taken place over the years with regard to the idea of "disparate impact" discrimination. Taking the phrase in the abstract, it is easy to see why Marks has challenged the salary instruction given here: Given that older workers are generally higher paid than younger workers, preferring lower paid to higher paid workers can show age discrimination because the preference has a "disparate impact" on older workers generally.

The error in the logic is reliance on an incomplete understanding of the legal idea of discrimination when discrimination is based on "disparate impact analysis." Disparate impact discrimination by definition involves a requirement or criterion which *does not* have a business justification. An examination of the original 1971 disparate impact case, *Griggs* v. *Duke Power Co.*, *supra*, 401 U.S. 424, shows that the idea of disparate impact discrimination was never intended to include purely economic business decisions.

*Griggs* involved a North Carolina power company which, right up to the day that title VII of the 1964 Civil Rights Act became effective, "openly" discriminated on the basis of race. (See *Griggs* v. *Duke power Co.*, *supra*, 401 U.S. at pp. 426-427 [91 S.Ct. at pp. 851-852].) During that time the company restricted blacks to the "labor" department, which was the only department in the company that did not require a high school diploma. On the day after title VII became effective, the company required new employees seeking employment outside the labor department to register satisfactory scores on two professionally prepared aptitude tests. About two and one-half months later the company also required incumbent employees lacking a high school education seeking transfer from the labor or coal handling departments to an "inside" job to pass two tests, one purporting to measure general intelligence, the other mechanical comprehension. "Neither test," the court would later note, "was directed or intended to measure the ability to learn to perform a particular job or category of jobs." (*Id.* at pp. 427-428 [91 S.Ct. at p. 852].) Thirteen Black employees challenged both the high school diploma

---

before us. Marks has not argued that the evidence, as a matter of law, *compelled* a finding that the employer did not carry the burden imposed by the regulations.

requirement, as well as the test requirements, claiming that because the requirements rendered "ineligible a markedly disproportionate number of Negroes, they were unlawful under Title VII *unless shown to be job related.*" (*Id.* at p. 429 [91 S.Ct. at p. 852], italics added.) The United States Supreme Court granted a hearing on the claim, eventually reaching the conclusion that the diploma and test requirements contravened title VII.

In analyzing *Griggs,* it is too easy to become diverted by the employer's purported lack of intent to discriminate. The federal trial court had concluded that there was "no showing of racial or invidious intent" in the adoption of the diploma or general intelligence test requirements,[29] and from that innocence leapt to the conclusion that the sin of the requirements was their disproportionality as such.

Not so. The leitmotif of the *Griggs* opinion is the lack of relationship between the requirements and the "employment at hand." (See 401 U.S. at p. 431 [91 S.Ct. at p. 853-854].) It is a theme to which the court returned again and again: "Both [of the requirements] were adopted . . . without meaningful study of their relationship to job-performance ability." (*Id.* at p. 431 [91 S.Ct. at p. 853].) "Congress has placed on the employer the burden of showing that any given requirement must have a manifest relationship to the employment in question." (*Id.* at p. 432 [91 S.Ct. at p. 854].) "History is filled with examples of men and women who rendered highly effective performance without the conventional badges of accomplishment in terms of certificates." (*Id.* at p. 433 [91 S.Ct. at p. 854].) "What Congress has forbidden is giving these devices and mechanisms [testing or measuring procedures] controlling force unless they are demonstrably a reasonable measure of job performance." (*Id.* at p. 436 [91 S.Ct. at p. 856].)

Similarly, the court characterized the problem of the test and diploma requirements *not* as to their effect on a group *qua* group, but as to their effect on individuals who otherwise could do the job. " 'Indeed, the very purpose of title VII is to promote hiring on the basis of job qualifications, rather than on the basis of race or color.' " (401 U.S. at p. 434 [91 S.Ct. at p. 855], quoting a memorandum from the floor managers of the legislation in 110 Cong. Rec. 7247.) "What Congress has commanded is that any tests used must measure the person for the job and not the person in the abstract." (*Id.* at p. 436 [91 S.Ct. at p. 856].)

A portion of the opinion which is sometimes taken to suggest that disproportionality of burden on a given group was the essence of the opinion

---

[29]One is, however, entitled to be somewhat skeptical of this innocence when one remembers that the test requirements were adopted *the day after* title VII became effective.

belies that suggestion when considered in its entirety. Confronting the problem that the trial and intermediate appellate courts had concluded the employer had not intended to discriminate, the *Griggs* opinion stated: "The Court of Appeals held that the Company had adopted the diploma and test requirements without any 'intent to discriminate against Negro employees.' [Citation.] We do not suggest that either the District Court or the Court of Appeals erred in examining the employer's intent; but good intent or absence of discriminatory intent does not redeem employment procedures or testing mechanisms that operate as 'built-in headwinds' for minority groups . . . ." (401 U.S. at p. 432 [91 S.Ct. at p. 853] .)

But one should not stop reading at that point. The sentence ends with the key words, "*and are unrelated to measuring job capability.*" (401 U.S. at p. 432 [91 S.Ct. at p. 854], italics added.)

The point is unmistakable that disproportionality alone could not establish discrimination. The necessary glue to make the newly built "disproportionate impact" doctrine hold together was a lack of relationship to the job. Hence the court, in an oft-quoted phrase, juxtaposed the idea that a practice can be discriminatory in operation with its lack of business justification: "The Act proscribes not only overt discrimination, but also practices that are fair in form, but discriminatory in operation. *The touchstone is business necessity.*" (401 U.S. at p. 431 [91 S.Ct. at p. 853], italics added.)

Given the emphasis on job relatedness, job performance, individualized assessment of ability to do a job, and business necessity, it is unfathomable that disparate impact analysis should apply to differentiation on the basis of salary. Such differentiation goes to the very essence of any enterprise.

Like the phrase "better qualified" in Government Code section 12941, the phrase "business necessity" as used in *Griggs* should not be given an artificially narrow, economically unreasonable meaning. Someone looking for a way to apply disparate impact might, of course, try to distinguish between back-to-the-wall, brink-of-bankruptcy "necessity" and a situation in which an employer has a little more latitude. The *Camacho* court, for example, asserted that in evaluating the "reasonableness of certain employment practices" bankrupt employers "will almost always win motions for summary judgment," implying that *sometimes* an across-the-board wage reduction will not meet that test, presumably some point beyond bankruptcy. (See *Camacho* v. *Sears Roebuck de Puerto Rico, supra,* 939 F.Supp. at pp. 122-123.) The model of the law inherent in the distinction is that only businesses which are on the brink of ruin are allowed to make decisions based on cost.

We perceive no intent on the part of the Legislature to distinguish between companies that are failing, companies which are just keeping their heads above water, and companies which are rolling in money in this regard. There is not one age discrimination law for the marginally profitable, and another for the highly profitable. Parsing "business necessity" from the normal conduct of any business is unpersuasive in the extreme. Most fundamentally, *all* businesses, indeed all enterprises including government and nonprofit entities, have a legitimate interest in saving money—from the bankrupt to the most profitable. Companies once thought, like the Titanic, to be unsinkable have come close, and even sunk into bankruptcy because they did not control costs. It may be easy for judges, looking at one year's income statement, to assert that a salary restructuring violates age discrimination laws because the company was making too much money at the time, but that is an extremely short-sighted and unrealistice view of "business necessity."[30] Similarly, the question of how much profitability is "too much" and therefore takes a company out of some strict necessity rule involves courts in determinations for which they are manifestly ill-equipped. Business people, rather than judges, are presumed to know what is best for their own businesses. As the court in *Dale* v. *Chicago Tribune Co.* (7th Cir. 1986) 797 F.2d 458, 464, wrote in another context, a court "does not sit as a super-personnel department that reexamines an entity's business decisions."

Additionally, a strict necessity element in disparate impact analysis would make absolutely no sense in the context of a government entity or department. What member of the Legislature is going to stand up and make a speech in which he or she says that state and local governments have so much money to burn that they should avoid cost-cutting measures because they are not under a strict "necessity" to save the taxpayers' money?

## X

### *The Special Verdict Forms*

Marks presents a number of challenges to the special verdict form. All of these arguments were waived because Marks's counsel made no objection to the form as it finally went to the jury.

---

[30]The *Camacho* model also represents an extremely short-sighted view of judicial administration. For firms which are barely profitable, it would merely encourage companies to file for bankruptcy so as to demonstrate a "business necessity" which otherwise might not be accorded a "downsizing" decision.

## XI

### *Evidentiary Exclusions*

Finally, Marks brings a potpourri of evidentiary contentions. The first is that the trial court erred in rejecting *his* evidence that defendants had *suppressed* evidence of job openings in Colorado Springs. His opening brief includes no record references on the point. Because of the absence of record references Loral's attorney states that she cannot respond to Marks's argument. We share her exasperation and do not consider the argument because it is not properly made. (E.g., *Bray* v. *International Molders & Allied Workers Union* (1984) 155 Cal.App.3d 608, 618 [202 Cal.Rptr. 269]; see also 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 475, p. 467.)

Marks next claims that the trial court improperly excluded evidence of Marks's qualifications for certain job openings. Again, however, Marks does not present his point in such a way as to allow for meaningful review. He mentions only two specific items, neither of which begins to approach prejudicial error. First, he complains that the trial judge did not allow him to say, in describing what he had been doing *after* termination, that he had been employed as an "accountant." Since the testimony concerned work experience after termination, any connection to Marks's layoff was so highly attenuated as to make any error harmless. Second, he says the trial court did not allow evidence of testing Marks received after his layoff. Again, any relevance here was clearly so attenuated to his ability to do a particular job within Loral's system that any error in the exclusion was harmless.

Next Marks claims that certain *deposition* testimony of Rick Jensen, the controller of Loral's Colorado Springs division, was improperly excluded. The general thrust of the deposition was that various people with whom Jensen spoke had a very low opinion of Marks's accounting abilities. ("Marks had been labeled as a person who really didn't have alot of accounting abilities.") Jensen related that James Hellmich, Marks's supervisor, had said that Marks "had had performance problems, that he had been downgraded at one point in his career, and also indicated that there was a pending legal action against the company for something that had occurred either in Detroit or shortly after the move to Newport Beach." Marks now complains that the exclusion of the deposition testimony pursuant to Evidence Code section 352 was an abuse of discretion, because it hindered him from showing that testimony from Loral officers that they decided not to hire him on the merits (as distinct from not hiring him because he had a pending EEOC claim) was not believable.

Given the low level of identification of the EEOC claim in Jensen's testimony—he mentioned it only in passing and then only vaguely ("something that occurred" somewhere), the hearsay nature of the testimony (what

so and so said) and the disrespect shown at a personal level (not having anything to do with his age: e.g., "some very unfavorable comments were being made about this individual to the point of poking fun at and really having low regard for him. It was done in a social environment and it was quite unprofessional") set forth in the deposition, we cannot say the trial judge abused his discretion.

## XII

### Conclusion

We find no error, particularly in the jury instruction allowing employers to make decisions based on salary differentials. The key words in the salary instruction were "based on salary." As worded, there is no question that the instruction was correct: An employer *is* entitled to choose employees with lower salaries, even though this may result in choosing younger employees, if the choice is *indeed* based on salary.

On the other hand, we must also make it clear that the age discrimination laws, as Judge Easterbrook noted in his dissenting opinion in *Metz*, forbid using salary as a *pretext* or "euphemism" for a decision *really* based on age (See *Metz* v. *Transit Mix, Inc.*, supra, 828 F.2d at p. 1220 ["All of this does not deny the force of the position . . . that the ADEA forbids use of wage as a euphemism for age."].) Furthermore, consistent with the rationale of this opinion, evidence that an older worker was willing to work for the same or substantially equal pay as a younger replacement *would indeed* constitute substantial evidence of age discrimination.[31] After all, experience and seniority necessarily count for something—all else being equal, an employer may be presumed to prefer an employee with experience over an employee without it because the employer would be getting, in effect, greater value for the money.

Here, however, the *jury* rejected Marks's evidence supporting pretext. They believed the substantial evidence in the record that Marks simply was not all that good an accountant and *that* was the reason the company laid him

[31]Apropos of our discussion of 29 United States Code section 623(a)(3), and to be consistent with our rationale, that we think it would be a perverse error indeed to hold that the provision in the federal age discrimination statute which precludes employers from reducing wage rates "to comply" with the age discrimination statute itself should be used to inhibit market transactions that would *otherwise* take place. As we have shown above, that is not the purpose of section 623(a)(3). It would be ludicrous to hold that the statute prohibited an employer and older employee from reducing the older employee's wage rate so as to allow the older employee to be competitive in the labor market. (Cf. Comment, *"Overpaid" Older Workers and the Age Discrimination in Employment Act* (1996) 71 Wash. L.Rev. 769, 790-792.)

off and did not bend over backwards to place him elsewhere in the organization.[32] We have no power to reweigh the jury's evaluation.

We are also not unmindful of the pain attendant with the loss of any job, particularly when the loss is sustained by an older worker for whom, as Labor Secretary Wirtz noted in his 1965 report, retraining may be more difficult. There is a poignancy in such situations, such that the *Metz* court was moved to quote Arthur Miller's Death of a Salesman (" 'You can't eat the orange and throw the peel away—a man is not a piece of fruit!' ")[33] and Secretary Wirtz to quote Robert Frost's The Death of the Hired Man (" 'nothing to look backward to with pride, nothing to look forward to with hope' ").[34] Conversely, we are not unmindful that the image of some newly minted whippersnapper MBA who tries to increase corporate profits—and his or her own compensation—by across-the-board layoffs is not a pretty one. Even so, neither Congress nor the state Legislature ever intended the age discrimination laws to inhibit the very process by which a free market economy—decisionmaking on the basis of cost—is conducted and by which, ultimately, real jobs and wealth are created.

The judgment is affirmed.

Wallin, J., and Rylaarsdam, J., concurred.

A petition for a rehearing was denied August 22, 1997, and appellant's petition for review by the Supreme Court was denied October 29, 1997. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.

---

[32]Marks presented evidence that he would be willing to take a pay cut. The jury simply did not give that evidence as much weight as the evidence showing that Loral had acted without any age animus. Had the jury returned a verdict in Marks favor, we would have no trouble in affirming the ensuing judgment.

[33]*Metz* v. *Transit Mix, Inc., supra,* 828 F.2d at page 1205, footnote 6.

[34]Labor Secretary's Report, *supra,* at page 1.